[No. 6,588.—In Bank.]

# LOS ANGELES IMMIGRATION AND LAND CO-OPERATIVE ASSOCIATION v. LOUIS PHILLIPS.

CONTRACT — SPECIFIC PERFORMANCE.— A court of equity will not enforce any contract unless it be complete and certain as to parties, as well as to price, subject-matter, etc. Nor can the aid of court of equity be had to specifically enforce that which is only the basis of an agreement, and not the agreement or contract itself.

ID.—ID.—CONSTRUCTION—DELIVERY OF DEED.—In an action upon the document set out in the opinion, the Court found, in effect, that the same was executed by the plaintiff and defendant for the purpose and with the intent of making a full and complete settlement of all demands then existing between them; that the plaintiff had fully performed the terms of the agreement, and had executed, and the defendant had freely and voluntarily accepted, a deed, in pursuance of the agreement. *Held*, that the document referred to was not a contract, but a mere basis of a contract, to be framed after further negotiations; and could not be enforced in a court of equity, or an action for damages be maintained upon it; and *held*, further, that the evidence (as stated in the opinion) was insufficient to justify the finding as to a delivery of the deed.

APPEAL from a judgment for the plaintiff, and from an order denying a new trial, in the Seventeenth District Court, County of Los Angeles. SEPULVEDA, J.

*Thom & Stephens, Hutton & Godfrey,* and *Glassell, Smith & Smith,* for Appellants.

The document executed November 25th was not a completed contract, but a mere proposition of Phillips to serve as a basis of a contract afterwards to be executed. (*Fuller* v. *Reed,* 38 Cal. 99.) The document expressly provides for obligations to be assumed by other parties, and these obligations form an essential, and indeed the most important, part of the consideration to Phillips. The contract could not be complete, therefore, without the signatures of the parties upon whom these obligations were to devolve. (*Tewksbury* v. *O'Connell,* 21 Cal. 68; *Townsend* v. *Corning,* 23 Wend. 435; *Livingston* v. *Rogers,* 1 Caines, 584; *Emery* v. *Neighbours,* 2 Halst. 145.) The finding as to the delivery of the deed to Phillips, and its acceptance by him, is not sustained by the evidence.

*Thomas H. Smith, George C. Gibbs,* and *Brunson & Wells,* for Respondent.

The defendant is estopped, by his voluntary acceptance of the deed from us, from denying full and complete performance of the contract by the plaintiff; and in equity and good conscience, he is bound to perform on his part. (Civ. Code, §§ 1501, 1589; Code Civ. Proc. § 2076; Herman on Estoppel, §§ 323, 327, 328; *Horn* v. *Cole,* 51 N. H. 287; 12 Am. R. 116, 117, 122–124; *Simpson* v. *Pearson,* 31 Ind. 1; *Douglass* v. *Scott,* 5 Ohio, 195; 6 Wait's Actions and Def. 705.) The return of the deed did not vest us with our former estate. (*Bowman* v. *Cudworth,* 31 Cal. 148; *Killey* v. *Wilson,* 33 id. 691; *Lawton* v. *Gordon,* 34 id. 36.)

THORNTON, J. :

This action was brought to compel the performance by defendant of a contract alleged to have been entered into by him with the plaintiff corporation.

It is alleged in the complaint, that some time in April, 1875, the plaintiff and defendant entered into two certain contracts for the sale of lands by the latter to the former; that in July, 1875, the parties above named entered into another contract for the sale of a tract of land by the defendant to the plaintiff; that in one of the tracts of land above referred to as agreed to be sold in April, 1875, one Tonner had an interest, which he agreed to sell to plaintiff, but that the purchase-money due to Tonner had been fully paid, and therefore he (Tonner) had no longer any interest in the matter in litigation; that by the terms of two of the contracts above referred to, portions of the purchase-money were to be paid in cash, and the remaining portions at days in the future, specified in said contracts, with interest as set forth therein; that the cash payments were made as agreed on, and promissory notes were executed for the credit payments; that by the terms of the contracts it was stipulated between the parties that the plaintiff should have the right, at any time within three years next after the dates of the contracts respectively, to sell any of the lands described in

the contracts at not less than thirty-five dollars per acre; that the defendant would join in a bargain and sale deed to the purchasers, upon condition that at the same time there should be paid to the defendant an amount of money equivalent to thirty-five dollars per acre for the portion of land thus sold, and an additional amount equal to one-half of the difference between the sum of thirty-five dollars and the price for which such portion of land should be sold, the money so paid to defendant to be received by him, and credited upon the promissory notes before mentioned, until they were fully paid off.

It is further averred, that the possession of said tracts of land was delivered to plaintiff by the vendors Tonner and the defendant; that plaintiff entered into such possession, and caused permanent and valuable improvements to be made on the said tracts of land, of the value of $25,000, and held possession of said tracts until the execution of a deed from plaintiff to defendant, on the 31st day of December, 1877, as afterwards set forth in the complaint; that before the 15th of November, 1877, plaintiff sold to numerous persons various portions of the several tracts of land above mentioned, took from each of the purchasers promissory notes drawing interest, for the purchase-money of the lands sold, and at defendant's request indorsed and delivered to him the said notes and contracts, as collateral security for the payment of its notes to defendant, and made divers payments in money to defendant on account of the aforesaid purchase from him, all of which are fully stated in an exhibit to the complaint; that on or about the 15th of November, 1877, for the purpose and intent of making a full settlement of all dues, debts, etc., then existing between them, plaintiff and defendant entered into a contract in writing, by the terms of which, and in consideration of the mutual promises therein contained, defendant bound himself to purchase from the plaintiff all the lands described in the contracts above mentioned then remaining unsold, and then known as the Pomona lands and the Pomona tract, at the rate and price of thirty-five dollars per acre; and that defendant would credit plaintiff's notes held by him, as above set forth, with the value of said unsold lands at the rate of thirty-five dollars per acre, and that he (defendant) would purchase enough of the contracts of purchase then held

by him as collateral security, for their face and the interest due thereon, to fully pay all of plaintiff's obligations to defendant, and that he would convey to plaintiff, by deed, all the remaining lands embraced in said original contracts, and before that time sold to plaintiff, and would assign to plaintiff the contracts entered into, and promissory notes given by purchasers for said lands last named, then held by him as collateral; that it was by said contract further agreed between the parties aforesaid, that a corporation should be created and organized under the laws of the State of California, by Thomas A. Garcy, the president of the corporation plaintiff, the defendant, and any persons who might be disposed to subscribe for its stock; that the object and purposes for which said corporation was to be created were, to develop the waters of San Antonio Creek, a stream of water flowing near the said Pomona lands, with which to irrigate said lands; to sell the water, for purposes of gain, to the inhabitants of Pomona; that the capital stock of said corporation was to be $25,000, of which defendant agreed, by the contract just referred to, to take $10,000, and to pay assessments thereon, from time to time, as fast as the corporation should require the funds to carry into effect the purposes for which it was formed, such assessments not to exceed in the aggregate fifty per cent. of the par value of the stock; and the plaintiff bound itself to see that the balance of said stock was taken on like terms, and to procure the obligations of said Garcy and one H. J. Crow, and each of them, to give to the defendant the first right to purchase all stock taken by them in said corporation, at any time within two years from the time that the waters of San Antonio Creek should be brought to the town of Pomona by said corporation, and to transfer to said corporation all the capital stock of a corporation known as the Pomona Water Company, then owned and held by plaintiff; that, by the terms of said contract, defendant was to have the right to the use of water from said corporation to be formed, sufficient to irrigate certain lands mentioned in said contract, for which defendant was to pay as provided by its terms; that plaintiff complied with the terms of said contract on its part to be performed; that defendant failed to take the stock in said corporation which was formed, or to pay any money on it, or to

perform any of the obligations of said contract upon his part to be performed, to the damage of plaintiff in the sum of $15,000 United States gold coin; that said Garcy and Crow each subscribed for sixty-three shares of the stock of said corporation, of the par value of $6,300; that $12,500 would have been sufficient to build and construct the flumes, ditches, and other works of said new corporation, and would have enabled said company to introduce the waters of San Antonio Creek upon the Pomona lands, and to have irrigated the unsold portions thereof, and to have brought said waters on the lands of defendant, to have irrigated the same as required in the said contract, and would have provided said water company with a large surplus of water, which it would have sold; that on the 31st of December, 1877, the plaintiff delivered, and the defendant accepted, the obligations in writing of said Garcy and Crow, to give to the defendant the refusal of the stock taken by them in said corporation above mentioned, at any time within two years from the time that the waters of said San Antonio Creek should be brought to the town of Pomona by said water company, and the plaintiff also on the same day delivered to the defendant, who accepted the same, a deed, in due form of law, duly executed and acknowledged by plaintiff, conveying to the defendant all the estate of plaintiff in and to all the unsold lands, and the unsold portions of the Pomona track mentioned in said contract, which conveyance defendant has ever since retained; that on the delivery and acceptance of said deed, the plaintiff demanded of defendant that he should comply with the stipulation of said contract on his part to be performed, which defendant refused and still refuses to do, to the damage of plaintiff in the sum of $22,676.96 in gold coin; that since said demand, defendant has wrongfully sold and assigned to other parties, whose names are unknown, whereby he has put it out of his power to perform the obligations of said contract, to the damage of plaintiff in the sum of $22,676.96; wherefore, plaintiff demands judgment against defendant for the sum of $37,676.96 in United States gold coin, for his damages; that plaintiff's promissory notes and obligations for the purchase-price of said lands be declared to be fully paid off and satisfied, and that defendant be ordered and directed by the Court to

surrender up said notes and obligations to be canceled; and that plaintiff may have such other and further relief in the premises as to the Court may seem equitable and just, with costs of suit.

Defendant answered the complaint, and denies, on information and belief, that plaintiff is or was at any of the times stated in the complaint a corporation duly organized or existing under the laws of California. He admits the executions of the contracts stated in the complaint executed in April and July, 1875; that plaintiff entered into the possession of the lands referred to in said contracts under the terms thereof. He denies that plaintiff ever placed or erected on said lands permanent or other improvements of the value of $25,000; that on the 31st of December, 1877, or at any other time, plaintiff executed to him any deed; denies any contract as alleged entered into by him with plaintiff, on or about the 15th of November, 1877. Defendant further denies performance of the terms of said contract by plaintiff, as alleged in the complaint, or that he refused to subscribe, or take, or pay for $10,000 stock in the new water company; or that he has failed in any manner, or at all, to perform any obligation on his part; or that he has damaged plaintiff in any way or sum, or at all. He avers, that neither the plaintiff nor the said water company ever had any interest or right to the water of the Arroyo of San Antonio, or any part thereof; and further avers, that the said water, and the right to its use during all the times mentioned in the complaint and ever since, has been and now is the property of other parties. He denies the delivery by the plaintiff at any time, or the acceptance by defendant of any obligation of Garey and Crow, or either of them; or the delivery by plaintiff of any deed executed to him on the 31st of December, 1877, or at any time, or that he has retained in his possession at any time such deed; and denies, that plaintiff has ever kept or performed the terms of any contract with him. Denies any damage to plaintiff in any sum, that he (defendant) has at any time wrongfully or fraudulently sold, or assigned, or transferred any of the contracts in the complaint mentioned, to the damage of plaintiff in any sum whatever. He admits, that on or about the 15th day of November, 1877, he signed a paper writing with Thomas A.

Garey and F. B. Fanning, who pretended to act for and as president and secretary of plaintiff; and avers, that said instrument was signed by him without any consideration whatever, and because of the false and fraudulent representations made to him by Garey and Fanning, and H. J. Crow, who was interested therein with Garey and Fanning, which representations were at the time known by Garey, Fanning, and Crow to be false and fraudulent, but then believed by defendant to be true. He further avers, that said paper writing was and is absolutely void, and of no effect. The cause was tried by the Court, and judgment was rendered for plaintiff. The defendant moved for a new trial, which was denied, and he took an appeal from the judgment, and the order denying his motion for a new trial.

The decision of this cause turns mainly on the construction of certain documents which appear or are referred to in the findings.

The Court below, having found the facts as to the three contracts for the purchase of lands mentioned in the complaint, the possession of the plaintiff of the lands embraced in these contracts, the payments made to defendant on these purchases, the sales made by plaintiff of portions of the lands, and the transfer of the notes and contracts by plaintiff to defendant as collateral security in accordance with the terms of the contracts above referred to, proceeds to make the following finding:

"About the 15th day of November, 1877, and before the 22nd day thereof, for the purpose of and with the intent of making a full and complete settlement of all demands then existing between them, plaintiff and defendant entered into an agreement, the substance of which plaintiff has purported to set forth in paragraph xi of the complaint herein; but, in fact, said contract or agreement was to the effect and in the words and figures as follows, and not otherwise:

"Memorandum of items of agreement between Louis Phillips and the Los Angeles Immigration and Land Co-operative Association, as a basis on which to conclude a contract for the sale to said Phillips of the remaining portion of land at Pomona. Phillips proposes to buy all unsold lands in Pomona, and the Pomona tract, for the sum of $35 per acre, and give credit for the same on notes held by him against the company. He

(Phillips) agrees also to purchase contracts for lands already sold by said association, for their face and interest thereon, sufficient to cancel the notes held by him against the association, and to deed to the said association all remaining lands sold by them under contract, and signing over to them the said contracts. Phillips, Garey et al. are to incorporate a water company, with a capital stock of $25,000, to handle the San Antonio waters. Phillips is to take $10,000 of the stock in said water company, paying thereon fifty per cent. by the time that said company shall need funds. The land association are to see that the balance of the stock is taken on the same terms. Phillips is to have the first refusal to purchase all stock taken by Garey and Crow at any time within two years from the time that the said waters of San Antonio are brought to the town of Pomona by said water company. The said land association are to transfer to the aforementioned new water company all the stock now remaining in the hands of the Pomona Water Company. Phillips is also to have the right to water from the said new water company for unsold portion of Pomona and Pomona tract; also for one thousand acres, more or less, of his other ' dry lands,' upon the payment by him of a royalty of $10 per acre.

    " Los Angeles Immigration and Land Co-operative Association, by         " THOS. A. GAREY, President.

[SEAL OF CORPORATION.]    " FRANK B. FANNING, Secretary.

                        " LOUIS PHILLIPS.

   " Witnesses :

       " H. K. W. BENT.

       " I. S. SEVERANCE."

It is urged, on behalf of appellant, that the document set forth in the above finding is not an agreement or contract, but merely the basis of an agreement. The respondent, on the contrary, insists that it is a contract, full and complete in all its parts, and executed, a breach of which has been committed by defendant, for which he is responsible to the plaintiff. The respondent's view of this document was taken by the Court below.

A court of equity will not specifically enforce any contract unless it be complete and certain. (*Honeyman* v. *Marryatt*,

21 Beav. 14; 6 H. L. Cas. 112; *Stratford* v. *Bosworth*, 2 Ves. & B. 341; *Tawney* v. *Crowther*, 3 Bro. C. C. 318.)   This rule applies as well to parties as to price, subject-matter, etc. Nor can the aid of a court of equity be had to specifically enforce that which is only the basis of an agreement, and not the agreement or contract itself.   (*Frost* v. *Moulton*, 21 Beav. 596; *Losee* v. *Morey*, 57 Barb. 561.   See also Pomeroy on Contracts, §§ 145–147; Fry on Specific Performance, §§ 342, 203, *et seq.*)

Upon an examination of the foregoing document, as found by the Court below, it will be observed that its title indicates, that, as a contract, it is incomplete.   The title is: " Memorandum of items of agreement between Louis Phillips and the Los Angeles Immigration and Land Co-operative Association, as *a basis* on which to conclude a contract for the sale to said Phillips of the remaining portion of land at Pomona."   Thus it is not treated as a contract concluded, but "*as a basis* on which to conclude a contract for the sale to Phillips " of the land referred to.   There are other circumstances in this document which indicate the incompleteness of the paper as a contract. It purports to be made between the plaintiff and the defendant as a momorandum for their action, yet it goes on to provide, that " Phillips, Garey et al. are to incorporate as a water company, with a capital stock of $25,000, to handle the San Antonio waters "; and further, " Phillips is to have the first refusal to purchase all stock taken by Garey and Crow at any time within two years from the time that the said waters of San Antonio are brought to the said town of Pomona by said water company."

. Who Garey et al. (who are mentioned with Phillips, as above pointed out) are, does not appear from the paper.   To be sure, the name of Thomas A. Garey is appended to the paper as the president of the plaintiff corporation.   But whether this is the Garey mentioned above, we can only conjecture.   At any rate, although it is stipulated that *Garey et al.* are to do something of great importance, they are not mentioned as parties to the so-called agreement, nor do they sign it.   The same is true as to the stipulation, that Phillips is to have the first refusal to purchase all the stock taken by Garey and Crow at any time, etc.   Neither of them have signed the paper, nor is Crow men-

tioned as a party to the agreement. There, then, is no agreement in this document binding on Garey, or the persons embraced in the expression " *et al.,*" to do anything; nor is there in it any stipulation binding Crow, or any one else, to sell any stock at any time to Phillips. Phillips could never, under this paper, have enforced anything as against Garey and Crow, nor could he have recovered any damages for the breach of anything contained in it. Further, it is set forth in this paper, that Phillips is " to have the right to water from the said new water company for the unsold portion of Pomona and Pomona.tract; also, for one thousand acres, more or less, of his other *dry lands,* upon the payment by him of a royalty of $10 per acre." Where are the other dry lands referred to? There is nowhere found any description of them. It is impossible to say what lands are here referred to as Phillips's " dry lands," to irrigate which water was to be furnished on the terms mentioned. These considerations, drawn from the paper itself, show that it was not to be regarded as a contract, complete in all its parts, but as a memorandum of items from which the parties might, on a future occasion, draw up *in extenso* a contract complete as regards the matters referred to in it, and certain in its terms, and to which other persons are to be parties.

There are other considerations which lend force to this conclusion. A most essential part of the arrangement contemplated between the plaintiff and defendant was to devise some means to develop and make useful the waters of San Antonio Creek, and it is expressed in the document just referred to, " *to handle the San Antonio waters.*" The Court finds, that "neither the plaintiff nor the said new water company ever had any title to the water of said Arroyo San Antonio, or any part thereof, and said water, and the rights to its use during all the time mentioned in the complaint, ever since has been and now is the property of other parties." (See 13th finding of fact.)

It became necessary to acquire the waters of San Antonio Creek, for they could not be developed or handled unless they were under the control of the parties desiring to develop and handle them.

The testimony in the transcript shows that H. K. W. Bent, A. R. Meserve, and C. F. Loop claimed to have some owner-

ship in these waters. On the 2nd of November, 1877, the following instrument was executed at Los Angeles:

"LOS ANGELES, November 2nd, 1877.

"At a meeting of persons interested in fluming the waters of San Antonio Creek, held this day in the office of H. K. W. Bent, in Los Angeles, at which were present H. K. W. Bent, A. R. Meserve, Rev. C. F. Loop, Louis Phillips, T. A. Garey, II. J. Crow, J. E. McComas, and L. M. Holt, the following points were agreed upon: Bent, Meserve, and Loop, representing the owners of the half-interest in the waters of San Antonio Creek, agree to sell a quarter of the stream to Mr. Phillips and the other gentlemen present for the sum of $18,750, gold coin. Phillips and his party agree to purchase such water at said price, and pay for the same as follows: They will build a flume from a point near the Kincaid dam to the north line of the Palomeres tract, of sufficient capacity to carry 500 inches of water under a six-inch pressure. The bottom of flume is to be of one and one-half inch redwood, and the sides of one and three-quarters inch redwood, with clamps every five and one-half feet. The flume is to be not less than two feet wide and sixteen inches deep. They also bear one-half of the expenses of a dam, at or near Kincaid's dam, for dividing the waters, to cost not to exceed five hundred dollars; dam to be located at such point as may be mutually agreed upon. If the water is taken from the base side of the stream, then the Phillips party are to construct such an aqueduct across the wash as may be deemed best by a competent board of judges to be mutually selected. The pipe and flume is to be estimated in the trade at $15,000; and the cost, if greater than that amount, is to be borne by Mr. Phillips and his party; they (the Phillips party) agree to put in the sum of $3,750, within three years, in improvements or developing water, provided that their cost, or the dam, which is to cost not to exceed $500 (one-half to be borne by Phillips's party), and the cost of the flume from a point even with the Kincaid dam to the dam to be built, is to be deducted from the $3,750. Phillips's party also agree to put a division in the flume from a point not to exceed two and one-half inches from the lower end of the flume down to the lower end, in order to divide the waters of Bent, Meserve, and Loop from the waters belonging to

Phillips's party.    The parties hereto hereby agree to consum-
mate this trade and pass all necessary papers within fifteen days
from this date.

"A. R. MESERVE, H. K. W. BENT, THOS. A. GAREY, L. M.
HOLT, C. F. LOOP, LOUIS PHILLIPS, H. J. CROW."

Here was a commencement of an attempt to acquire an inter-
est in these waters.    The agreement just above quoted, it will
be observed, ends with a stipulation that the parties to it agree
to consummate the trade for the waters, and pass all necessary
papers within fifteen days from its date.

The memorandum first above quoted, made a few days later
in the same month of November, 1877, refers to " the *handling* "
of these waters by certain parties, through the means of a cor-
poration.    This is to be done by " Phillips, Garey et al. "    Here
we have some light thrown on the question, who " *Phillips, Ga-
rey et al.*" are ; but whether they are all the signers to the in-
strument of November 2nd, or those of the signers who are
styled in the last-mentioned paper " *the Phillips party,*" does
not clearly appear.

The above instruments in writing, which constitute such im-
portant features in this case, suggest that the consummation of
the agreement, the memorandum of the items of which appear
in the instrument of November 15th, was to depend on the con-
summation of the contract of November 2nd, in regard to the
San Antonio waters.    The uncontradicted facts in the cause
show that there was a difficulty in the way of procuring a title
to these waters.    The claim of Bent, Meserve, and Loop was
disputed, and in fact, in March, 1876, a judgment against Bent
and his coclaimants had been entered in the District Court of
Los Angeles County, in an action brought by them (Bent, Me-
serve, and Loop) against certain parties to enjoin them from
diverting these waters.    That the memorandum of November
15th, and its being carried out, were intended to turn upon the
acquisition of the San Antonio waters, is sustained by the testi-
mony of Bent and Holt.    Such, also, is the testimony of Phillips.
The documents themselves, and the testimony generally,
strengthen this conclusion.    A conveyance of the San Antonio
waters was never made either to plaintiff or defendant.    The
decree was against Bent, Meserve, and Loop, and although a

compromise was effected, which was reduced to writing and signed by Meserve and Loop, it does not appear that Bent ever signed it.

Now, according to the memorandum of the 15th of November, 1877, "*Phillips, Garey et al.* were to incorporate a water company, with a capital stock of $25,000, to handle the *San Antonio waters.*" That this was a material part of this memorandum of items (as it was styled), there cannot be a doubt. It does not appear that Garey and the other person or persons referred to by the words "*et al.*" ever made any agreement with the plaintiff or defendant, or any other person. There is an entire absence of testimony to establish any agreement to incorporate a water company of any character, made by Garey with any person whatever. Nor is there any testimony that Garey and Crow ever agreed with any person to transfer to Phillips whatever stock they might take in any such corporation. There is absolutely no testimony to show that they were in anywise bound to Phillips in any such stipulations as those above referred to. Phillips could never have enforced any such agreement, nor could he have recovered damages for the breach of any such stipulations, as no such stipulations ever existed. Still, the decree of the Court proceeds, upon the ground that such stipulations existed between Garey and other persons and Phillips. The foregoing considerations show that the memorandum of November 15th, so-called, was incomplete, was not a contract, but was a mere basis for a contract to be framed after further negotiations; and, in our opinion, that it neither should be enforced in a court of equity by the plaintiff against the defendant, nor could any action be maintained upon it by plaintiff to recover damages of defendant.

But it is contended, that, on the 31st day of December, 1877, Phillips accepted a deed of the lands referred to in the document of November 15th, 1877, and that therefore he has waived all right to object to the incompleteness of the contract, and is bound to carry out the so-called agreement, and pay for the lands mentioned in it. Conceding that he would have waived all right to make the objection referred to by accepting such deed and paying for such lands, we are of opinion that the evidence fails to establish any such acceptance, and

that the Court below erred in finding that any such deed was ever accepted.

We will review the evidence in relation to this matter. The only witnesses who testified as to this matter are George C. Gibbs and the defendant. The former (Gibbs) testified that he was a lawyer, a stockholder, and one of the directors of the plaintiff company since its organization in 1874; that on the 31st of December, 1877, he delivered four papers to Mr. Phillips at the depot of the Southern Pacific Railroad Company in Los Angeles (among which papers was the deed above referred to); that he read a portion of one of these papers, which was not the deed, to Mr. Phillips—read nearly the whole of it; when he got to a certain point in reading this paper, Phillips said that was enough, he understood it, took the papers witness gave him, and left him, and said it was all right. About forty days afterwards, Mr. Ross (Messrs. Thom & Ross were the counsel of defendant) came into his (witness's) office with three of the papers he had left with Phillips, one of which was the deed, and remarked that there were some valuable and interesting documents, that he would leave them with him, and left them on his table. "I told him I had no authority to take them." "Phillips made no objections to these instruments that I handed him." On cross-examination the witness said: "I have known Mr. Phillips four or five years pretty well. See him frequently in town—not often. I did not make any effort to find him that day. I knew he came to town that day, and I would be more liable to find him at the cars. Once or twice I tried to find him, but could not hear where he was, only I heard he was in town. I didn't know where his headquarters was. He was standing on the platform when I saw him. The cars did not go for ten or fifteen minutes afterwards. I remained there all the time till the cars left. The deed was executed several days before. It was given me that day, 31st December, by the secretary of the company, perhaps an hour before I started to deliver it to defendant. I didn't try to find Phillips in town."

Phillips testifies in relation to this matter, and states that he arrived at the cars in a hack; that Gibbs came to him and said, "'Mr. Phillips, I have got some papers.' I asked him what papers are they; that he pulled out one and commenced to read

it, and by that time they rang the bells for the cars to go, and I said, 'I will take it with me and read it at home,' and he put it in his pocket, and when he got home there was a deed among the papers. On the third day after, he sent the papers to Thom & Ross, his attorneys."

The testimony shows conclusively that the defendant was at the depot, just about to take the cars for his residence at Spadra, when these papers were delivered to him by Mr. Gibbs.

The transcript further shows a stipulation made at the trial that the deed and the other papers above referred to were given to defendant by Gibbs when he (Phillips) started for Spadra; that the reason they were not returned before the time they were put on Gibbs's table was, that there was a compromise pending which was not consummated; that during this time the plaintiff was not informed that Thom & Ross had the papers. Also, that Phillips knew nothing about the papers being kept by Thom.

Upon this testimony, the Court found the delivery of the deed in question by the plaintiff, and its acceptance by Phillips. We will remark here, that we have not given all the testimony of defendant at this point. We have stated all the testimony which could in any way have a tendency to sustain the finding of the Court below.

To hold, on this state of facts, that this deed was accepted by Phillips as a binding instrument, would be to sanction an injustice which no court should countenance. Excluding from consideration entirely the testimony of Phillips, and looking only to the testimony of Gibbs and the stipulation, no such conclusion as that reached at the trial of this cause can be sustained. A reasonable time is allowed by the law to a person to examine the most trifling book account, before the law raises the presumption of an admission of its correctness. Here this defendant, upon a reading to him of a portion of another paper in which there is a reference to this deed, when he is just about to take a train of cars to leave the spot where the paper is shown him to go to his residence, without an opportunity to inspect the paper held to bind him, is held conclusively bound in a complicated transaction, involving interests alleged to be of the value of from $75,000 to $100,000, and that without any opportunity to do

what every prudent business man would do—consult his counsel. The mere statement of the facts is sufficient to show that a judgment based on such a finding should not be allowed to stand. A greater length of time should be and would be allowed as to a book account amounting to $50, before a person would be held to have admitted its correctness. Mr. Phillips did what every prudent man of affairs would have done under the circumstances—took the papers, sent them to his counsel, and doubtless acted on their advice.

Judgment and order denying new trial reversed, and cause remanded.

SHARPSTEIN, J., McKINSTRY, J., McKEE, J., and MYRICK, J., concurred.

[Mr. Justice ROSS, being disqualified, took no part in the decision of this cause.]