[Civ. No. 7671. First Appellate District, Division One.—June 18, 1931.]

G. PARKER TOMS et al., Appellants, v. MARCO H. HELLMAN et al., Respondents.

Bauer, Wright & MacDonald, Bauer, MacDonald, Schultheis & Pettit, Alexander MacDonald and Fred E. Pettit, Jr., for Appellants.

Anderson & Anderson & Sheahan and Anderson & Anderson for Respondents.

V. K. Butler, Jr., and Pillsbury, Madison & Sutro, as *Amici Curiae* in Behalf of Appellants.

GRAY, J., *pro tem.*—To the first question asked by appellants of their first witness, respondents objected on the ground that the complaint as amended (hereinafter referred to as the complaint) did not state a cause of action. This objection was sustained and thereafter a judgment of dismissal was entered. The objection was, in effect, a general demurrer to the complaint. (*Moore* v. *Douglas,* 132 Cal. 399 [64 Pac. 705].) The parties agree that the sole question for determination upon this appeal is whether the complaint states a cause of action.

The complaint alleges that a named corporation, in December, 1921, had sold its bonds in the principal sum of $1,500,000 in accordance with a trust indenture, secured by its lands; that on May 29, 1926, $1,277,000 principal sum of said bonds was outstanding, which was subordinate to underlying liens of county taxes and bonds of certain reclamation and irrigation districts; that in May, 1926, the corporation was without cash and had defaulted in payment of the current installment of taxes, of interest on irrigation bonds, and of principal and interest on reclamation bonds; and that respondents at all times therein mentioned were the owners of the majority of the corporation's issued and outstanding stock. It is then alleged that on May 29 and June 9, 1926 (the latter clarifying the former), the respondents by letters addressed to the bondholders made a written offer to the bondholders, each letter being set forth *in haec verba,* and that, prior to June 25, 1926, the holders of more than seventy-five per cent in amount of outstanding bonds accepted in writing this offer, which acceptance is also fully set forth. In support of their complaint, appellants argue that the offer to execute, in the future, an agreement upon terms definitely and certainly set forth in the offer became, by acceptance, an enforceable contract. On the other hand, respondents in support of the court's ruling contend that the offer, being uncertain, indefinite, and incomplete as to the details of the future agreement, amounted, when accepted, only to an agreement to agree, and further the offer, contemplating by its terms the execution of a future written agreement, is not binding prior to such execution.

The legal principles, which the respective parties claim are here applicable are well stated and contrasted in the following excerpt from *Fly* v. *Cline*, 49 Cal. App. 414, 425 [193 Pac. 615] :

"It may be conceded that where the minds of the parties have met respecting the terms and conditions of the more formal writing that is to be executed by them and the agreed terms of the contract thereafter to be executed are certain and in all respects definitely understood and agreed upon in advance, either orally or by informal writing, there is in such case an obligatory contract dating from the making of the earlier agreement. (13 C. J., p. 290 et seq.) But it also is elementary law that, unless the agreement to execute the future contract be definite and certain upon all the subjects to be embraced, so that nothing is left for future negotiation, it is nugatory. (*St. Louis & S. F. R. Co.* v. *Gorman,* 79 Kan. 643 [28 L. R. A. (N. S.) 637, 100 Pac. 647].)"

The principle, which respondent claims is here decisive, is aptly expressed in the following language taken from *Dillingham* v. *Dahlgren,* 52 Cal. App. 322, 329 [198 Pac. 832] :

" 'It is essential to the validity of a contract that the parties should have consented to the same subject matter in the same sense. They must have contracted *ad idem.*' (*Breckinridge* v. *Crocker*, 78 Cal. 529, 536 [21 Pac. 179, 181].) In this connection one of the rules governing the creation of contracts in general is stated in 13 Corpus Juris, 289, section 100, as follows: 'The preliminary negotiations leading up to the execution of a contract must be distinguished from the contract itself. There is no meeting of the minds of the parties while they are merely negotiating as to the terms of an agreement to be entered into. To be final, the agreement must extend to all the terms which the parties intend to introduce, and material terms cannot be left for future settlement; nor is there a binding contract where, although its terms have been agreed on orally, the parties have also agreed that it shall not be binding until evidenced by writing.' The same rule applies whether the preliminary negotiations were oral or in writing, if it manifestly appears that certain parts of the contract are later to be agreed upon and inserted in the formal draft. The writer has carefully selected all of the follow-

ing cases as substantiating the foregoing proposition: *Fuller v. Reed,* 38 Cal. 99, 109; *Los Angeles Immigration & L. Co-op. Assn.* v. *Phillips,* 56 Cal. 539, 545; *Pacific Rolling Mill Co.* v. *Riverside & A. Ry. Co.,* 90 Cal. 627, 633, 634 [27 Pac. 525]; *Talmadge* v. *Arrowhead R. Co.,* 101 Cal. 367, 371 [35 Pac. 1000]; *Spinney* v. *Downing,* 108 Cal. 666, 668 [41 Pac. 797]; *Jules Levy & Bro.* v. *A. Mautz & Co.,* 16 Cal. App. 666, 670 [117 Pac. 936]; *Las Palmas etc. Distillery* v. *Garrett & Co.,* 167 Cal. 397, 400 [139 Pac. 1077]; *Mercantile Trust Co.* v. *Sunset etc. Co.,* 176 Cal. 461, 469 [168 Pac. 1037]; *Durst* v. *Jolly,* 35 Cal. App. 184, 190 [169 Pac. 449]. The rule is general in California whether the question arises in a case of specific performance (*Los Angeles Immigration & L. Co-op. Assn.* v. *Phillips, supra*); or an action to foreclose a mortgage (*Mercantile Trust Co.* v. *Sunset etc. Co., supra*); or an action to quiet title (*Durst* v. *Jolly, supra*); or an action for damages (*Talmadge* v. *Arrowhead R. Co., supra*); *Jules Levy & Bro.* v. *A. Mautz & Co., supra; Las Palmas etc. Distillery* v. *Garrett & Co., supra.*

"An agreement that parties will, in the future make such contract as they may then agree upon amounts to nothing. An agreement to enter into negotiations and agree upon the terms of a contract, if they can, cannot be made the basis of a cause of action. Where a final contract fails to express some matter, as, for instance, a time of payment, the law may imply the intention of the parties; but where a preliminary contract leaves certain terms to be agreed upon for the purpose of a final contract, there can be no implication of what the parties will agree upon. (*Shepard* v. *Carpenter,* 54 Minn. 153 [55 N. W. 906]. See, also, *Ridgeway* v. *Wharton,* 6 H. L. Cas. 263 [10 Eng. Rep. 1297].)"

The rule for which appellants contend is thus stated in *Levin* v. *Saroff,* 54 Cal. App. 285, 289 [201 Pac. 961], by the same justice who wrote the last-cited decision:

"Whether an instrument is a lease *in praesenti* or an agreement to execute a lease in future is largely a question of the intention of the parties. (*Jackson* v. *Kisselbrack,* 10 Johns. (N. Y.) 336 [6 Am. Dec. 341]; *Pacific Imp. Co.* v. *Jones,* 164 Cal. 260 [128 Pac. 404].) Nevertheless, where the parties have agreed upon all essential facts there is a binding contract, notwithstanding the fact that a more

formal contract is to be prepared and signed later. (Jones on Landlord and Tenant, *supra* [p. 170, sec. 137a] ; *Marcus* v. *Collins Bldg. & Const. Co.,* 27 Misc. Rep. 784 [57 N. Y. Supp. 737].) The mere fact that a written lease was in contemplation does not relieve either of the contracting parties from the responsibility of a contract which was already expressed in writing. When one party refuses to execute the lease according to the contract thus made, the other has a right to fall back on the written propositions as originally made, and the absence of the formal agreement contemplated is not material.''

The rule as to the necessity of the execution of a subsequent written contract is well phrased in *Conner* v. *Plank,* 25 Cal. App. 516, 518 [144 Pac. 295] :

''Counsel for appellant relies upon the proposition that where parties have agreed to reduce an understanding to writing, that it never becomes a binding agreement until it is written and signed by the parties to it. The principal cases relied upon in support of appellant's position are *Pacific R. & M. Co.* v. *Riverside etc. Railway Co.,* 90 Cal. 632 [27 Pac. 525], *Spinney* v. *Downing,* 108 Cal. 666 [41 Pac. 797], and *Las Palmas Winery and Distillery* v. *Garrett & Co.,* 167 Cal. 397 [139 Pac. 1077] [March 17, 1914]. These cases go no further than to establish the rule that, when it is a part of the understanding between the parties in negotiating the terms of their contract that the same be reduced to writing and signed by the parties, the assent to its terms must be evidenced in the manner agreed upon or it does not become a binding or completed contract. The record in each of the three cases above cited showed that the parties understood that the agreements were not to become binding upon either until evidenced in the written form. When the facts are at last stated, the rule relied upon here by the appellant will apply, but where, on the other hand, the contract is of such a nature that the law does not require it to be in writing and the terms of the contract are in the first instance definitely agreed upon and completed, then the mere fact that immediately thereafter they agree to evidence the contract by a written instrument does not interfere with the force and effect of the oral agreement.''

It now becomes our task to analyze the offer and apply the proper principle to the facts as so shown. Since the

second letter merely clarified the terms of the offer embodied in the first letter, they will be considered as together forming but one offer. According to the theory of the complaint, such offer addressed to the bondholders, when accepted by the latter, became a contract between respondents and such accepting bondholders. ▇ The contract, if any, being in writing, the intention of the parties is to be ascertained from it, alone, if possible (Civ. Code, sec. 1639), and its language, if clear and explicit, is to govern its interpretation. (Civ. Code, sec. 1638.) There being no doubt on the face of the offer, nor any alleged, the surrounding circumstances are not to be considered. (*United Iron Works* v. *Outer Harbor Dock Co.,* 168 Cal. 81 [141 Pac. 917].)

Since, admittedly, the forepart of the first letter merely informed the bondholders, under these quoted headings, as to corporate "Organization", "Improvements", "Financial Structure", "Fixed Charges Per Annum", "Sales Policy", "Present Condition of the Property", "Present Financial Status", "Recent Appraisal" and "Estimated Requirements to December 1st, 1928", the terms of the offer are to be found under the heading "Proposed Reorganization of the Bond Issue". Under the caption "Partial Distribution of Assets" there is outlined a proposed scheme for the retirement of certain stock in exchange for certain corporate assets, but this containing no offer is important only in so far as it may form part of the bond reorganization plan. Under the heading "Proposed Reorganization of the Bond Issue" respondents first state: "The signers of this letter own or control over 136,000 shares out of a total of 213,585 shares outstanding and after numerous conferences with the underwriters of the bond issue *are willing to cause the company to subscribe to the following procedure upon the following conditions.*" (Italics ours.) The first item of the procedure was "that a new bond issue of $1,277,000 First Mortgage Seven Per Cent Gold Bonds, dated June 1st, 1926, due ten years from date, be issued by the company and exchanged bond for bond with the present outstanding bonds". The second item was the providing of money to pay existing indebtednesses due for taxes, reclamation and irrigation districts assessments, and bond interest. As to raising these moneys, the letter stated (1) *"the undersigned stockholders are willing to agree that the directors of the company will levy*

*assessments upon stockholders* payable between now and December 1st, 1928, *in the aggregate sum of $3.00 per share,* or so much thereof as may be necessary to pay charges last above mentioned and (2) will also agree to see that the irrigation districts are operated in an efficient manner in so far as these funds will permit, and (3) *will also agree severally to pay said assessments* upon our said stock. (4) *The undersigned will also cause to be paid the coupons falling due on June 1st, 1926,* if, on or before June 25th, 1926, 75% of the bondholders file with the Trustee their assent to the reorganization plan, a copy of which assent is enclosed. . . . (5) *the undersigned will agree to have the company take the proper steps necessary* in the event there is a failure of any solvent stockholder to pay his assessment, *to enforce payment by suit.''* (Numerals and italics ours.) The third item was the partial distribution of assets. This is so because the partial distribution was expressly referred to and incorporated into the proposed reorganization and because the amount paid by withdrawing stockholders for their proportion of corporate debt was to be given to bondholders in reduction of bond debt.

██ The present action is predicated upon respondents' failure to cause the levy of assessments to the full amount of $3 and seeks damages for such failure. In so doing, they treat this part of the offer as a separate and distinct promise. Reading all parts of the two letters together, it is clear that the three items of procedure were interdependent and together formed the whole plan, and that respondents promised that the company should subscribe to the plan as a whole, but assumed no commitment to cause the directors to levy assessments except as part of the whole plan. The primary purpose to be accomplished was the issuance of new bonds, thereby postponing the maturity of the debt evidenced thereby. To protect the existing bond debt and to obtain further credit it was necessary to pay underlying charges by raising money through the levy of assessments. If the maturity of the debt were not delayed and foreclosure prevented by issuance of new bonds, no reason existed for the stockholders to agree to an assessment. It is apparent therefore that unless the primary purpose of the offer, to wit, issuance of new bonds, were accomplished, no advantage accrued to the stockholders in the consummation of

a subsidiary and auxiliary object. Since the offer was a unit, an uncertainty in any of its terms would prevent the formation of a contract by its acceptance. (*Meux* v. *Hogue,* 91 Cal. 442 [27 Pac. 744].)

Conceding that the offer as to the levy of assessments and their payment is complete, yet it is vitiated by the incompleteness and uncertainty in the details of the new bond issue and the partial distribution plan. The proposal fixed the principal sum, interest rate, and maturity of the new bonds and further provided that the new issue ''be secured by a trust indenture in the customary manner as approved by the Bondholders Reorganization Committee''. This sufficiently designated the property to be conveyed as security. In the absence of any allegation as to what is the customary manner, this phrase is clearly uncertain. (*Burnett* v. *Kullak,* 76 Cal. 535 [18 Pac. 401]; *Wineburgh* v. *Gay,* 27 Cal. App. 603 [150 Pac. 1003].) The offer possibly provides for the selection of a trustee by the committee, but it is silent as to his powers and duties; what shall constitute a default, except to negative any default as to interest, if land sales were inadequate for that purpose, and except to allow a default upon ''proper'' but unspecified notice for failure to pay underlying liens; and how he shall foreclose. The tentative nature of the offer is also shown by the provision for the approval of the committee to the form of the indentures. This uncertainty as to form also occurs in the provision for a release schedule of lands ''which may be adjusted by a majority of the Bondholders Reorganization Committee'' and in another provision that ''the committee may enter into an arrangement with the company to exclude such amounts'' from sales ''as are necessary in their opinion for sales commission, etc.'', because the number and method of selection of the members of the committee was undetermined. More uncertain is the offer as to distribution of assets for here no details are given at all, but the hope and belief is merely expressed that the commissioner of corporations will approve the plan devised and, subject to adjustments, a portion of the stockholders will accept. It would appear, therefore, that the offer was so incomplete and uncertain as to permit the formation of no contract by its acceptance.

■ For another reason, the acceptance of the offer failed to make a contract, because the offer by its terms clearly contemplated that the complete contract should be embodied in a written contract to be subsequently executed. The word "subscribe" in the phrase "the signers . . . are willing to cause the company to subscribe to the following procedure" clearly implies a subsequent written contract. The sentence: "We are willing to say that the committee as tentatively selected is agreeable to us in working out the necessary arrangements to carry the plan through"— shows that the letter was merely a tentative basis for negotiation, which was to culminate in a final written agreement. That the bondholders so understood it, is proven by the following statement in their acceptance: "It is understood that upon receipt by you of written expressions of approval from the holders of 75% in face value of outstanding bonds of the above company that the June 1st, 1926, coupons will be paid and *the necessary steps will then be taken to effectuate this plan.*" (Italics ours.)

In an attempt to plead an estoppel, the complaint alleges that the first letter was prepared by the company's secretary and counsel, submitted to the directors at a regular meeting, and forwarded to the bondholders, after consultation between appellants and a directors' committee appointed for that purpose; that one month later the directors granted the same committee full power to bind the company as to the details of the reorganization plan, especially as to the release schedule; that on August 9, 1926, with the knowledge and urging of respondents, seventy-five per cent of the stockholders entered into a bondholders' reorganization agreement constituting appellants their agents to effectuate the reorganization plan; and that from May 29 to October 1, 1926, respondents treated the offer and acceptance as a binding agreement and represented that they were obligated to perform the promises of the offer and suggested modifications to which appellants replied that they were relying on the agreement. Appellants next alleged that, from the date of the offer to the filing of the complaint, they relied upon the promises of the offer, particularly as to levy and payment of assessments, and because of such reliance did forego the rights of the bondholders to foreclose and that, after October 1, 1926, respondents did not in

good faith attempt to perform the reorganization plan, but arbitrarily refused to perform. Then follow allegations as to accrual of damages because of the lessened value of the bonds, due to the financial crisis created by the failure to levy assessments. Parenthetically this portion of the complaint convinces us as to the correctness of our previous conclusion as to the uncertainty of the offer. ▮ Estoppels must be mutual; and since the contract was unenforceable against appellants because of its uncertainty and its contemplation of a subsequent contract, as pointed out above, and could have been repudiated by them, they cannot urge that respondents were estopped because of their attempted compliance with its terms. (*Spinney* v. *Downing*, 108 Cal. 666 [41 Pac. 797].) It is also an essential element of an equitable estoppel that the party asserting it must be ignorant of the true facts. Here the terms of the agreement were in writing and therefore appellants cannot claim nor have they so pleaded that they were ignorant of the facts. ▮ Merely because respondents treated their offer as *binding* upon acceptance does not create an estoppel. (*Mercantile Trust Co.* v. *Sunset etc. Co.*, 176 Cal. 461 [168 Pac. 1037].)

Believing that the court's ruling was correct for the above reasons, it is unnecessary to consider further grounds urged by respondents to establish such correctness.

The judgment is therefore affirmed.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 18, 1931, and a petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 17, 1931.

Langdon, J., did not participate.