[Civ. No. 15646.   Second Dist., Div. One.   June 18, 1947.]

EARL L. CHURCH, as Executor, etc., Appellant, v. W. F. WADE et al., Respondents.

Lindelof & Perelli-Minetti and Jean Perelli-Minetti for Appellant.

I. Henry Harris and Robert J. Magdlen for Respondents.

WHITE, J.—This action was instituted by the special administrator of the estate of John L. Church, deceased, against W. F. and Mary Wade, husband and wife, to set aside a conveyance of certain real property by the decedent during his lifetime to defendants. The action is grounded on the claim that at the time of the conveyance the decedent was so mentally incompetent and unsound in mind that he was at that time and until his death wholly incompetent and incapable of comprehending or understanding the nature of such conveyance, and upon the further ground that there was a total lack of consideration.

Defendants by their answer denied the incompetency or physical and mental infirmity of the decedent, and also denied lack of consideration for the conveyance in question.

Defendants also filed a cross-complaint whereby they sought to quiet title in them to the aforesaid property.

Following trial before the court, judgment was rendered in favor of defendants and cross-complainants — denying plaintiff any relief under his complaint and quieting title to the property in defendants and cross-complainants. A motion for a new trial was denied. From the judgment and the order denying his motion for a new trial plaintiff prosecutes this appeal.

The decedent John L. Church died at Lancaster, in Los Angeles County, California, on March 30, 1945. At the time of his demise he was 79 years old. The immediate cause of death as reflected by a certified copy of the death certificate introduced into evidence was chronic myocarditis (10 years' duration), arteriosclerosis (15 years' duration), and asthenia, defined by a physician witness as "general weakness" (15 years' duration). The decedent had lived in Lancaster since 1929, residing there with his wife until the latter's death in January, 1940. They lived on the property which is the subject of this litigation. It consisted of four apartments,

each of three rooms with private bath and garage, and all furnished.

Defendant William F. Wade testified that the property was worth $5,000, and that the four apartments yielded a gross annual income of $1,404. Expenses for upkeep of the property did not exceed $200 per year. From February until November, 1944, the decedent was residing at the Horn Inn at Lancaster under what was characterized at the trial as "poor" conditions. Shortly after taking up residence at the Horn Inn the decedent offered the witness Mrs. Hazel Mae Pic a deed to his property if she would care for him, which offer she declined. Several times thereafter, decedent asked her "if I had changed my mind about it," to which she replied, "It is just like it was before."

Neither of the defendants were related to the decedent. Defendant William Wade was acquainted with decedent since 1940, and would casually meet and talk with him approximately two or three times a month.

In August of 1944, defendant William Wade and the decedent met on a street corner in Lancaster. During the conversation that ensued, according to defendant Wade, the decedent said, "Mr. Wade, you are just the fellow I wanted to see" to which defendant Wade replied, "What is wrong now, Dad?"; whereupon the decedent stated, "I have got to have a home, and if you will give me a home, I will deed you my property over here on Date Avenue." During the interim from August until decedent moved into the Wade home, on November 22, 1944, defendant Wade met and talked with the former some five or six times.

On the day decedent moved into the Wade home, the defendant Mrs. Wade accompanied him to the Bank of America Escrow Department where an escrow was opened covering the conveyance by decedent of the property here in question to the defendants. On December 8, 1944, decedent executed a grant deed conveying his Lancaster property to the defendants. No written agreement to care for the decedent was executed by the defendants.

Defendants caused to be prepared an agreement between themselves and the two sons of the decedent whereby it was agreed that decedent's sons would waive any claims to the Lancaster property which they might acquire "by reason of inheritance or otherwise," in consideration of the defendants' providing their father with a home and incidental expenses in connection with his care "which shall include medical and

hospital expenses when necessary, and paying expenses of his last illness and burial.'' This proposed agreement was forwarded to one of decedent's sons by defendant Mrs. Wade with a letter of explanation dated February 21, 1945, some three months after decedent went to live with the defendants, but was never signed by either of decedent's sons or by either defendant.

Following the death of decedent, one of his sons offered defendants the sum of $1,250 to relinquish the Lancaster property to the estate of his father, which offer was refused by defendant William Wade.

At the trial plaintiff herein agreed to reimburse defendants in any amount fixed by the court as reasonable for the care and support extended by them to the decedent.

As a first ground of appeal, it is earnestly contended that the trial court's findings of fact numbered V and VIII are not supported by the evidence. The challenged findings read as follows:

### "V.

''That the said decedent John L. Church knew the nature and extent of his property at the time of such conveyance and was competent and capable.''

### "VIII.

''That the act of conveyance of said decedent John L. Church was his free and voluntary act, and he was not acting under undue influence, nor was he cheated or defrauded, nor was such the intention of the defendants W. F. Wade and Mary Wade.''

In support of his claim in this regard, appellant directs our attention to certain letters written by defendant Mrs. Wade to decedent's sons between November 22, 1944, and the death of decedent on March 30, 1945, which, according to appellant, show that decedent was ''ill, unable to write, confused.'' Appellant also points to the causes of death and testimony of decedent's attending physician. Conceding that medical treatises dealing with the diseases with which decedent was afflicted point out that the mental defects occasioned by such diseases in a chronic state constitute a serious handicap to the transaction of business, nevertheless it is conceded by medical authorities that the rule in that regard is not fast or rigid and each case must be decided by a study of the facts thereof and the conduct and behaviour of the particular pa-

tient so afflicted. In the instant case decedent's attending physician, who had known him since 1935 or 1936, and had seen and talked with him "many times," testified as follows concerning decedent's mental condition during the last four days of his life:

"Q. Was there anything in his conduct at that time to indicate to you that he was suffering from any mental ailment? A. None whatsoever, no."

. . . . . . . . . . . . .

"Q. Now, on these visits did you have conversations with him at that time? A. Yes.

"Q. Was he rational? A. As far as I could determine, yes.

"Q. Was there anything to indicate at any of these conversations you had with him, either at the time of the last illness or at the time that you talked to him in the fall of '44, that indicated to you that he was incompetent? A. No, none that I could see."

While there was evidence that the decedent was weak and sickly; was suffering from the infirmities of old age; that he wandered "all over town at odd hours"; that he refused to eat regularly or properly; that at times he was given to mumbling and talking to himself; that he frightened small children by slipping his dentures out of his mouth, and that he was incompetent, there was nevertheless, the positive medical testimony hereinbefore narrated, coupled with the testimony of the escrow clerk that upon the occasion of the opening of the escrow and execution of the deed here under consideration the decedent knew "what was going on," that he "was competent," and at all times "knew all of the details of what was going on and what he was getting for the property he was conveying." It was also shown in evidence that at all times preceding the execution of the deed to defendants the decedent was managing his property, collecting his rents, writing to his sons and displaying a knowledge of the nature and extent of his property. There was also other direct and positive testimony that the decedent was competent.

In view of the foregoing, appellant's attack upon the findings of fact as not being supported by the evidence must fall. It is well settled and firmly established in our law that where findings or a judgment are assailed on the ground that the record is barren of any substantial evidence to support the same ". . . the power of the appellate court in passing on this question begins and ends with a determination as to,

whether there is any substantial evidence, contradicted or uncontradicted, which will support the verdict rendered by the jury; and on appeal from a judgment for defendant in an action for damages for negligence, all conflicts in the evidence must be resolved in favor of the defendant, and all legitimate and reasonable inferences indulged in to uphold the judgment, if possible; and when two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the jury. (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427 [45 P.2d 183].)'' (*Arundel* v. *Turk*, 16 Cal.App.2d 293, 295 [60 P.2d 486].)

Pertinent to the situation with which we are here concerned is the language of this court in *Poe* v. *Lawrence*, 60 Cal.App. 2d 125, 131 [140 P.2d 136], wherein we said:

''Legion of authority supports the statement that when an attack is made upon a judgment on the ground that it is unsupported by the evidence, the power of reviewing courts is limited to a determination of whether there is any substantial evidence, contradicted, or uncontradicted, which will support the judgment rendered. Therefore, on appeal from a judgment for plaintiffs in an action for damages for negligence, all conflicts in the evidence must be resolved in favor of the prevailing party. Because it is the rule that all intendments are in favor of the judgment arrived at upon conflicting evidence, the fact that contradictory inferences can reasonably be drawn from the facts in evidence does not authorize an appellate tribunal to substitute other inferences for those drawn by the constitutional and statutory arbiter of the facts. Of course, if the evidence is inherently improbable it may be disregarded, but before such action is warranted there must exist a physical impossibility of the evidence being true, or its falsity must be apparent without any resort to inferences or deductions (*Whitsett* v. *Morton*, 138 Cal.App. 628, 629, 630 [33 P.2d 54]; *Arundel* v. *Turk*, 16 Cal.App.2d 293, 295, 296, 297 [60 P.2d 486]).''

In considering appellant's claim of the insufficiency of the evidence to support the challenged findings, it is our duty to so construe the evidence as to support the contention of respondents to the extent that it is fairly susceptible of such construction, and in cases of conflict to accept as true that evidence which tends to sustain the findings and judgment, unless it is inherently so improbable as to be palpably false.

No such stricture can reasonably or justly be applied to respondent's evidence herein.

Appellant next urges that findings made by the trial court that the agreement on the part of the defendants "was adequate consideration for such transfer" and that the defendants "performed each and every term, condition and covenant of the agreement" are not supported by the evidence. That on the contrary the evidence shows that the conveyance was predicated upon a written contract for life care—which in fact was never drafted or signed. The only evidence to that effect to which appellant directs our attention is the testimony of the escrow clerk, who testified that the decedent and defendants "discussed" the preparation of an "agreement" and the escrow clerk suggested "they see an attorney." What the nature of the proposed agreement was, or its terms, is not made to appear in the record. Appellant seemingly contends that the agreement referred to was the above-mentioned unsigned agreement which defendants had prepared and forwarded to one of decedent's sons, but this contract was not one between decedent and defendants. The former was not intended to be a party thereto. It was a proposed agreement prepared by the defendants at the suggestion of the decedent some three months after he executed the grant deed. The only testimony in regard to that contract was given by defendant Wade who testified, "Well, it seems as if Mr. Church (decedent) wanted to be sure that he had an agreement with me in writing that he did have a home . . . and have them (decedent's sons) sign those papers to let them know that he was securing a home." Nowhere in the evidence does it appear that the contract was contemplated or considered by the parties during the negotiations leading up to the opening of the escrow and the execution of the grant deed, and, in any event, by its very terms the proposed contract clearly indicates that it was not intended that the decedent should or would be a party thereto. It was merely a proposed agreement, prepared subsequent to the transfer of the property to defendants whereby the two sons of the decedent would quitclaim to defendants any interest they might presently have or be entitled to by right of inheritance. Furthermore, the terms of the oral agreement between decedent and defendants were fully performed by both parties thereto.

The futility of appellant's claim that the understanding between decedent and defendants was that before a contractual

relationship should exist between them after their oral agreement, the terms thereof should be reduced to writing and signed by them, is manifest from what was said by this court in *Kreling* v. *Walsh,* 77 Cal.App.2d 821, 834 [176 P.2d 965] (hearing denied by the Supreme Court) as follows: "Furthermore, a contract to make or execute a written agreement, when in all respects the terms thereof are mutually understood and agreed upon, is as valid and obligatory where no statutory objection interposes, as the written contract would be if executed. The test is—did the minds of the parties meet; that a proposal for a contract was made by one party and accepted by another; that the parties definitely understood and agreed upon the terms of the contract; and, finally, that as a part of the mutual understanding it was agreed that a written contract embodying the terms agreed upon should be prepared and executed by the respective parties. Under such circumstances, neither party is at liberty to refuse to perform. (*Thompson* v. *Schurman,* 65 Cal.App.2d 432, 440 [150 P.2d 509] ; *Nolte* v. *Southern California Home Building Co.,* 28 Cal.App.2d. 532, 534 [82 P.2d 946] ; *Clarke* v. *Fiedler,* 44 Cal.App.2d 838, 847 [113 P.2d 275].)"

The evidence sustains the view of the trial court that there existed an oral agreement between decedent and defendants which was fully performed by both parties thereto. There is no evidence to support a finding that decedent and defendants contemplated a reduction to writing of their agreement before it was to be considered as complete. The full performance by both parties to the oral agreement negatives any such finding.

Finally, appellant insists that the agreement which was entered into between decedent and defendants was void because of failure to comply with certain provisions of the Welfare and Institutions Code of the State of California. Appellant concedes that this issue was not pleaded or raised during the trial, but urges that regardless of his failure to set up the claim of illegality of the contract, when the case made out by appellant showed its illegality it became the duty of the court *sua sponte* to declare the agreement void and cancel the conveyance (*Endicott* v. *Rosenthal,* 216 Cal. 721, 728 [16 P.2d 673]). Appellant also proposed amendments to the findings of fact and conclusions of law submitted by respondent, covering the claim that respondent had not complied with the provisions of the Welfare and Institutions

Code. Appellant argues that if as a matter of law, the contract is illegal, this court should now refuse to enforce it regardless of the pleadings of the parties (*Fewel & Dawes, Inc.* v. *Pratt*, 17 Cal.2d 85, 92 [109 P.2d 650]). On his motion for a new trial in the court below, appellant raised the question on the ground of newly-discovered evidence which with reasonable diligence he was not able to produce at the trial. In a supporting affidavit by appellant's counsel it was averred that on March 5, 1946, following the trial, the Department of Social Welfare advised appellant's counsel in writing that "neither defendant had received a license or permit from the department or the State to care for aged people or to receive property as consideration for old age contracts; and also that Mr. Zahl, of the Department, on March 12, 1946 in counsel's office advised him the provisions of the Welfare and Institutions Code involved here were so poorly indexed and obscure that attorneys were not aware of them and for that reason the Department had an article published in the State Bar Journal which did not come to counsel's attention until after the trial."

Appellant proceeded to try this case on the theory that the decedent John L. Church was incompetent at the time he entered into the agreement with respondents and that there was a total lack of consideration for such agreement. The theory upon which a case was tried must be adhered to on appeal. This rule of law is grounded on the premises that were the grounds raised for the first time on appeal, urged before the trial court, such grounds might have resulted in the admission of evidence and the making of findings which would have obviated a reversal. (*Ernst* v. *Searle*, 218 Cal. 233, 240 [22 P.2d 715]; *Reiner* v. *Hermann*, ■(Cal.App.) 176 P.2d 734; *Mathews* v. *Pacific Mut. Life Ins. Co.*, 47 Cal.App. 2d 424, 428 [118 P.2d 10].)

■ However, deciding as we have, to give consideration to appellant's last-mentioned claim, the record reveals that for support of his contention that the agreement here in question was void and illegal, he relies upon sections 2300 to 2360 of the Welfare and Institutions Code of this state, which he claims "provide a complete scheme under which aged persons may be boarded, life-care agreements entered into, and property transferred in return for life-care."

Section 2300 reads:

"No person, association, or corporation shall, without first having obtained a written license or permit therefor from the State Department of Social Welfare or from an inspection service approved or accredited by the department, maintain or conduct any institution, boarding home, or other place for the reception or care of aged persons, nor receive or care for any such person."

The foregoing section is found in chapter 2 of division 3 of the Welfare and Institutions Code and is titled "Institutions and Boarding Homes for Aged Persons." Manifestly, under the facts here present, respondents did not "maintain or conduct any *institution, boarding home, or other place for the reception or care of aged persons*" (emphasis added). The agreement here in question did not therefore offend against any of the aforesaid code provisions.

The attempted appeal from the order denying plaintiff's motion for a new trial is dismissed. For the foregoing reasons the judgment is affirmed.

York, P. J., and Doran, J., concurred.

A petition for a rehearing was denied July 11, 1947, and appellant's petition for a hearing by the Supreme Court was denied August 14, 1947.