[Civ. No. 22864.   Second Dist., Div. One.   Apr. 9, 1958.]

BETA SIGMA TAU (a Nonprofit Corporation), Respondent, v. SHRINE CIVIC AUDITORIUM (a Corporation), Appellant.

A. G. Ritter for Appellant.

Herbert W. Simmons, Jr., for Respondent.

WHITE, P. J.—Defendant Shrine Civic Auditorium appeals from the judgment in favor of the plaintiff, Beta Sigma Tau, a college fraternity and nonprofit corporation, for

$2,695 and costs, in plaintiff's action for damages for breach of contract.

Appellant urges that the judgment should be reversed for the following reasons: (1) that there is no evidence to sustain the finding that a contract was made; (2) that there is no evidence of any breach of contract by defendant; and (3) that there is no evidence to sustain the finding that plaintiff was damaged by any act of defendant.

The following is a fair summary of the evidence tending to support the finding that a contract was made. We have ignored all denials and conflicts, as we must.

Benjamin W. Alston, a student at the University of California at Los Angeles, was on July 15, 1954, the president of the undergraduate chapter and chairman of the board of directors of the plaintiff. He was authorized by plaintiff to secure the rental of an auditorium in which to stage a jazz concert for the benefit of the "Mark Rashmir" fund. On or about July 15, 1954, he called the Shrine Auditorium on the telephone and talked with someone who said he was Mr. McMeekin, the manager. He requested and received information as to the availability of the auditorium for certain tentative dates and asked Mr. McMeekin if he would "place a hold on his books for the date of August 20th." Mr. McMeekin "said that this could be done" and for the witness to come in and talk to him about it as soon as he had his arrangements made. "At the first contact," he "did not enter into a complete arrangement with them"; he "entered into a tentative arrangement with them." The witness believes he talked with Mr. McMeekin a second time on the telephone before he saw him. In that second telephone conversation Mr. McMeekin said "he would change the hold from the 20th to the 27th," and "when it was convenient to come in and we could iron out the details."

About July 29, 1954, Mr. Alston went to the Shrine Auditorium to talk about the matter and Mr. McMeekin "made the oral contract." That was the first time he had been "in the Shrine Auditorium to talk about this matter." At that time, he "had already made arrangements or commitments" for some of the performers, for tickets and publicity. He made those commitments before he had any conversation with Mr. McMeekin in person about leasing the auditorium, but after he "had Mr. McMeekin's assurance over the telephone that the auditorium would be held" for him on August 27th. He had been told by Mr. McMeekin over the telephone the amount

of rental for the auditorium was $800 ''which was agreeable'' to him and to their purposes, and he had Mr. McMeekin's assurance that he would hold it for them until they came in to make the arrangements, and Mr. McMeekin had told him to come in at the earliest possible opportunity to get the details ironed out. Mr. McMeekin told him that at the time the written lease was executed there would be a deposit of $200, one-fourth of the rental fee, ''which could have been any time up to the 27th of August.'' Mr. Alston further testified as follows:

''Q. Well, why did you enter into these contracts with these other agencies when you knew that a written contract was necessary with the Shrine before this lease would be—— A. Because Mr. McMeekin had assured me that I would have the auditorium available to me on that night. I took his word as a business man—as an honest business man.

''Q. You knew, did you not, that it was necessary to enter into some kind of a lease agreement? A. I considered this nothing more than a formality.''

. . . . . . . . . . . .

''Q. And he told you that all those things would have to be straightened out and also the payment made before there would be any agreement with you, didn't he, and the lease signed? A. No, sir, he told us we could be assured that the house would be ours on the evening of August 27th and therefore I took the writing or the executing of the lease to be nothing more than a formality.''

Also, referring to the conversation of July 29, 1954, Mr. Alston testified as follows:

''Q. By Mr. Simmons (Plaintiff's Attorney): Will you relate to the Court at this time just what was said during the course of this conversation? A. Well, I informed Mr. McMeekin I had secured some tentative arrangements with some performers for the date of the 27th, and inquired if that date were open, if the auditorium would be available at that time.

''He informed me it would be available. I then discussed with him what the terms were of renting the auditorium, all of the necessary details to make arrangements to rent the auditorium for that date.

''Q. What did he say and what did you say in respect to the exact rental of the auditorium at that time? A. He told me the total rental fee would be $800.00. That he would

reserve the auditorium for us for that evening, and that he would request a down payment of one fourth of that amount at the time we signed the written agreement.

"He told me that this price would include everything with the exception, I believe, of the use of the spotlights and an operator for the spotlights. The fee would include a stage manager, as I recall. It would not include the services of the ushers or guards, that is, we would have to provide these for ourselves or secure the services of these for ourselves.

"That we could either pay cash right then or we could pay it, as I say, later on at such time as we went into a written agreement. The only occasion he would call on us for the cash would be if someone else came in with cash in his pocket and was interested in that date; but otherwise the auditorium was ours—and in this event we would be given the opportunity of putting our cash first down.

"Q. Was there any discussion about reserving the auditorium? A. Yes, he definitely said it was reserved to us for that date.

"Q. What date was that? A. August 27th.

"Q. You testified to the fact that there was no request for cash at that time, is that right? A. No, there was not.

"Q. Did you have any discussion about your making arrangements and contracts with the artists to perform? A. I told him the reason I wanted the date is that I had tentative arrangements with some of the performers for that date.

"Q. What was said, if anything, about your going ahead and making actual contracts? A. I told him if I could be assured of the date, I could take up the options I had received with these groups to perform on that night.

"Q. What was his statement as to that? A. He said, 'You're all set,' or something of that nature."

Mr. Alston next heard from Mr. McMeekin on or about the 7th or 9th day of August, at which time Mr. McMeekin telephoned and told him "I'm sorry but the arrangements are off"—"the arrangements for the leasing of the auditorium for that evening had been cancelled." Mr. Alston went to the auditorium to see Mr. McMeekin and was again told that the "arrangements were discontinued—that the auditorium was no longer available." Later, on the 11th or 14th of August, he "offered to pay Mr. McMeekin the entire $800.00 to complete the contract." Mr. McMeekin said: "Sorry, it was too late——."

All contracts may be oral, except such as are especially

required by statute to be in writing. (Civ. Code, § 1622.) There is no claim in the instant action that a contract for the leasing of the auditorium was required to be in writing.

In respondent's brief, the decision in *Toms* v. *Hellman,* 115 Cal.App. 74, 78 [1 P.2d 31], is cited, and the following language quoted therefrom: ". . . (W)here the parties have agreed upon all essential facts there is a binding contract, notwithstanding the fact that a more formal contract is to be prepared and signed later." In *Toms* v. *Hellman, supra,* an objection was sustained on the ground that the complaint did not state a cause of action and judgment of dismissal was entered. That judgment was affirmed on appeal for the reason that (p. 83) "the acceptance of the offer failed to make a contract, because the offer by its terms clearly contemplated that the complete contract should be embodied in a written contract to be subsequently executed."

Respondent continues, in its brief, with the following statements: "A contract to make or execute a written agreement, when in all respects the terms thereof are mutually understood and agreed upon, is as valid and obligatory where no statutory objection interposes, as the written contract would be if executed." (Citing *Kreling* v. *Walsh,* 77 Cal.App.2d 821 [176 P.2d 965], and *Church* v. *Wade,* 80 Cal.App.2d 412 [182 P.2d 212].)

In *Kreling* v. *Walsh, supra,* this court affirmed judgments for defendants upon their affirmative defense that prior to the trial said actions had been settled and compromised by oral agreement entered into in the court corridor while awaiting trial, the general terms of which had been stated by the respective counsel to the court in which the matter was put over for four or five days to allow the preparation of the stipulation to release moneys under attachment. Appellant's argument that the oral agreement was purely tentative and preliminary and should not be enforced was disposed of by the statement, at page 832, that "There was substantial evidence to support the court's finding that not only did appellant enter into an oral agreement of compromise and settlement, but that he later signed a contract embodying the terms of such oral agreement. Furthermore, the agreement was performed in full by appellant and respondents, save and except that the former did not withdraw his own money. . . ."

In *Church* v. *Wade, supra,* judgment for defendants in an action to set aside a conveyance which had been made to them

in consideration of their oral agreement to give the grantor a home, support and medical care for life was affirmed by this court. After quoting, at page 419, a portion of the Kreling decision, this court said:

"The evidence sustains the view of the trial court that there existed an oral agreement between decedent and defendants which was fully performed by both parties thereto. There is no evidence to support a finding that decedent and defendants contemplated a reduction to writing of their agreement before it was to be considered as complete. The full performance by both parties to the oral agreement negatives any such finding."

In the instant action, all witnesses agree that in each of the conversations found to constitute the oral agreement it was expressed and understood that it was necessary to sign a written lease and at the same time to pay $200 to apply upon the rental. In the entire record there is no evidence as to when, if ever, the remainder of the $800 rental was to be paid. Nor does it appear that respondent ever agreed to pay the $800 at any certain time, or at all. No consideration of any kind passed from respondent to appellant.

The Toms, Kreling and Church cases, *supra,* are not authority for the decision in the instant action that an oral agreement was made. ▮ Whether such contract was made depends upon the intention of the parties and is to be determined by the surrounding facts and circumstances in the particular case. It is a question to be determined by the trial court, and if there is any substantial evidence in support of the decision an appellate court is not authorized to reweigh the evidence. (*Johnston* v. *20th Century-Fox Film Corp.,* 82 Cal.App.2d 796, 820-821 [187 P.2d 474]; *Thompson* v. *Schurman,* 65 Cal.App.2d 432, 440 [150 P.2d 509].)

▮ Considering the evidence in the instant action, with all inferences favorable to respondents, we have been able to find only an offer or proposal by appellant that a written agreement be signed and deposit paid for the leasing of its auditorium on August 27th. ▮ An offer can be accepted only in accordance with its terms. ▮ A proposal may be revoked at any time before its acceptance is communicated to the proposer. (Civ. Code, § 1586.) ▮ According to Alston's own testimony, he made no offer to sign a lease and his only offer to pay any money was at least two days after appellant's withdrawal of its offer.

This court is sympathetic with respondent in its losses, but finds no basis in the record for the judgment against appellant. There being no oral agreement, there could be no breach thereof, and no liability on the part of appellant for respondent's losses. Respondent's losses were caused by its erroneous assumption that it could, without binding itself to pay the rental or perform the other obligations of the lessee, secure all the benefits which could have been obtained by the signing of the lease and payment of the rental.

The judgment is reversed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied April 30, 1958.