[L. A. No. 28409.   In Bank.   July 3, 1967.]

RICHARD J. STENGER, as Administrator With the Will Annexed, etc., et al., Plaintiffs and Respondents, v. CLARA ANDERSON et al., Defendants and Appellants.

Robert W. D'Angelo and Clarence Hansen for Defendants and Appellants.

Baum & Aran and Robert M. Aran for Plaintiffs and Respondents.

Thomas C. Lynch, Attorney General, and Edward M. Belasco, Deputy Attorney General, as Amici Curiae on behalf of Plaintiffs and Respondents.

TOBRINER, J.—In this case we are called upon to construe for the first time certain statutes which seek to protect

the health and welfare of aged persons in California when they enter into contractual relationships with those who would proffer life care in return for the receipt of property. We deal here with legislation designed to prevent the infliction of harm to the elderly by those who are not fully qualified to care for them under proper conditions and on reasonable terms. Specifically, we must decide whether the laws regulating prepaid life care for the aged[1] extend protection to persons who purchase life care on an individual rather than an institutional basis; we hold that the provisions in question protect such persons and conclude that the trial court properly cancelled the instant life care agreement on the ground that it violated the controlling sections of the Welfare and Institutions Code.

We then examine another aspect of the transaction: We consider the trial court's finding that the defendants exploited their confidential relationship with the decedent and thereby obtained her property. We sustain the court's conclusion and hold that its ruling on the contract furnished an independently sufficient basis for rescission of the challenged life care agreement and cancellation of the joint tenancy deed concurrently executed.[2]

## I.

Bessie Thorson, an 86-year-old widow, owned a home on Melbourne Avenue in Los Angeles. She lived there with her 84-year-old brother, Gilbert Larson, and rented rooms to four other individuals. One of the occupants, Mrs. Clara Anderson, enjoyed a free room, received all of the rents from the other boarders, collected a monthly stipend from Mrs. Thorson, and shared the old age pension of Mrs. Thorson's brother. In return for these payments and privileges, Mrs. Anderson assumed responsibility for maintaining the rooming house and

---

[1]Welf. & Inst. Code, §§ 2300-2360. In 1965, these sections were renumbered (Stats. 1965, ch. 1784, § 5) and now appear as sections 16200 to 16318. All references to sections 2300 to 2360 herein will be to the Welfare and Institutions Code prior to the renumbering of 1965.

[2]In August 1962, plaintiffs' decedent filed a complaint against the defendants, seeking cancellation of the contract and of the joint tenancy deed and seeking to quiet title to the property described therein. After a nonjury trial, the court found that the defendants had procured the agreement and the deed by unconscionable means and that they had entered into a life care contract violative of sections 2300 and 2350. The trial court accordingly entered judgment for plaintiffs, cancelled the joint tenancy deed, quieted title in the decedent's estate, and awarded plaintiffs costs. Defendants thereupon instituted this appeal.

attended to the personal needs of Mrs. Thorson and Mr. Larson.

Mrs. Thorson became increasingly dependent upon Mrs. Anderson's assistance and friendship as her own physical and mental condition deteriorated. Her comprehension and memory began to fail her, and she grew to rely upon Mrs. Anderson as something of a nurse and financial advisor, as well as a housekeeper and companion. Declining health, of course, brought in its wake the fears and anxieties of old age, and on several occasions Mrs. Thorson expressed the hope that Mrs. Anderson would not abandon her. Mrs. Anderson nonetheless said that she would leave unless given "some sort of security." To this end, she selected an attorney to whom she took Mrs. Thorson for legal advice. As the trial court noted in its memorandum of decision, the evidence leaves "some doubt . . . whether [the attorney] represented [Mrs. Thorson] or the conflicting interest of Mrs. Anderson who on cross-examination stated [that] if the attorney had sent her the bill, she would have paid it."

In any event, after discussing matters with the attorney, both privately and in the presence of Mrs. Anderson and Mr. Larson, Mrs. Thorson finally signed an agreement dated June 15, 1962, providing, in substance, that Mrs. Anderson would continue to care for Mrs. Thorson and her brother for the remainder of their lives in exchange for such compensation as Mrs. Anderson was already receiving for her services, and that, in return for Mrs. Anderson's promise to render lifetime care, Mrs. Thorson would transfer the ownership of her home, valued at approximately $23,000, to Mrs. Anderson, to herself, and to her brother, by a joint tenancy deed executed on the same date as the underlying agreement.[3]

Shortly after signing the documents necessary to execute this transaction, Mrs. Thorson told a former tenant who came to visit her that she had done "a horrible thing." Asked why she had entered into the agreement with Mrs. Anderson, she explained that Mrs. Anderson, together with Mr. Larson, had harassed her "all day long, constantly, for weeks" until

[3] The agreement recited that the deed, although absolute on its face, was executed "subject to a condition subsequent . . . that . . . Clara Anderson [would continue] to provide for the care, comfort and happiness of Bessie C. Thorson and Gilbert G. Larson" during their joint lives and during the life of the survivor. Mrs. Anderson would forfeit her interest in the property if she failed "in any substantial respect" to comply with her agreement to care for the elderly couple "in the same manner and to the same extent that she [was then] doing."

"finally [I] got tired and signed the papers." When Mrs. Thorson told the tenant that she "was scared to stay there any longer," he helped her to "escape."

Mrs. Thorson later told an attorney that she could not recall having been forced to sign any agreement and could think of no objection to returning to her former home; when she made these statements, she was unable to remember her address or to recall the name of the city in which she lived.

## II.

We discuss first the defendants' failure to comply with applicable provisions of the Welfare and Institutions Code. The Legislature has set forth a number of requirements which an organization or individual must meet before receiving a transfer of property from an aged person in return for an agreement to furnish life care.[4] Without alleging that they have complied with any of the statutory requirements, the defendants rest their case upon the assertion that the statutory provisions should be applied only to institutional care;[5] they argue that a contract by an individual, promising to provide personal care for life in a private home, falls outside the ambit of the Welfare and Institutions Code. We cannot accept so narrow a reading of the statute.

---

[4]Under section 2350, for example, the recipient of property under such a life care contract must first obtain (1) a written license or permit from either the State Department of Social Welfare (§ 2300) or the State Department of Mental Hygiene (Welf. & Inst. Code, § 6201, Health & Saf. Code, §§ 1400-1421); and (2) a nontransferable certificate of authority (§ 2358) from the State Department of Social Welfare (hereinafter referred to as "the department"), the issuance of which depends upon a showing of financial responsibility (§§ 2350.1, 2350.5, 2350.6).

The agreement between the recipient and the aged person must be executed on a form previously approved by the department (§ 2352) and must comply with specified disclosure requirements (§ 2353; see also § 2359.1), and the party receiving property in exchange for such an agreement must establish and maintain certain monetary reserves (§ 2351).

The department may promulgate regulations governing the provision of prepaid care for the aged (§§ 2301, 2354), may inspect the premises where such care is provided (§ 2302), and may revoke or suspend the license and the certificate of authority of a property recipient who violates its regulations or fails to maintain sufficient reserves (§§ 2305, 2356, 2357). Any person who cares for an aged individual (other than a relative within the second degree) without first having secured the appropriate license and certificate, or who refuses to permit an authorized inspection, is guilty of a misdemeanor (§§ 2309, 2359).

[5]Defendants also urged below that, since a cause of action involving failure to comply with the Welfare and Institutions Code had been stricken at the pleading stage, it could not be reintroduced into the case by pretrial amendment. This contention assumes a procedural rigidity which does not characterize the law of this state. (See *De La Beckwith* v. *Superior Court* (1905) 146 Cal. 496 [80 P. 717]; *Grimes* v. *Carter* (1966) 241 Cal.App.2d 694, 698 [3] [50 Cal.Rptr. 808].)

Defendants rely primarily upon *Church* v. *Wade* (1947) 80 Cal.App.2d 412, 420-421 [182 P.2d 212], holding that the statutory sections governing prepaid life care apply only to institutional contracts and not to contracts between individuals. Although the reasoning of the *Church* opinion seems questionable,[6] we need not disturb the precise holding of that case insofar as it construed the statutes *as they then read,* since the crucial section of the Welfare and Institutions Code (§ 2350, now § 16300) at that time required a license as a prerequisite to a receipt of property under a life care agreement only in the case of a recipient "organization or person maintaining a home for the aged.'"[7] Although the Legislature retained this restrictive language when it amended the section in 1951,[8] it deleted the language from the statute in 1953, broadening the section to its presently unqualified inclusion of "*any* organization or person." (Italics added.)[9]

As amended in 1953, section 2350 thus provided for the first time that "*Any* . . . person may receive transfers of property from an aged person conditioned upon an agreement to furnish life care" only if "such . . . person has received a written license or permit . . . and . . . has been granted a certificate of authority by the State Department of Social Welfare.'"[10] In thereby closing the loophole created by *Church,* the Legislature evidently concluded that the protective purposes of section 2350 would be undermined if the comprehensive regulatory program of which that section was a part could reach only institutionalized life care agreements.

---

[6]In reaching its conclusion, the court in *Church* simply noted that section 2300 appeared in a chapter entitled "Institutions and Boarding Homes for Aged Persons." (80 Cal.App.2d at p. 421.) Yet ever since 1937 the Welfare and Institutions Code has expressly provided that "Division, part, chapter, article, and section headings contained herein shall not be deeemd to govern, limit, modify, or in any manner affect the scope, meaning, or intent of the provisions of any division, part, chapter, article, or section hereof." (Welf. & Inst. Code, § 6.)

[7]Stats. 1943, ch. 924, § 1, amending Stats. 1939, ch. 475, § 2.

[8]Stats. 1951, ch. 1719, § 2.

[9]Stats. 1953, ch. 1488, § 1, reenacted with amendments not here relevant, Stats. 1955, ch. 1370, § 1, and Stats. 1957, ch. 1328, § 1, Stats. 1965, ch. 1784, § 5.

[10]*Ibid.* Defendants urge that, despite this unequivocal language, we should construe section 2350 to exclude property transfers to private individuals on the theory that only those who *own* homes and institutions for the aged may obtain licenses under section 2300. A reading of the latter section reveals, however, that *all* persons who "maintain or conduct" places "for the . . . care of aged persons," regardless of ownership, may be licensed.

When it enacted section 2350, the Legislature proceeded upon the premise that aged persons who seek the security of prepaid life care must be protected from exploitation by those who lack the ability or the inclination to meet the complex and diverse needs of the elderly. By broadening section 2350, the Legislature responded to the obvious realization that individuals, no less than institutions, may take advantage of the aged; that, however laudable the motives of individual housekeepers, friends, and servants, they cannot automatically be trusted to provide continuous care without the supervision which the Welfare and Institutions Code has long demanded of experienced and professionally staffed organizations.

Indeed, the Legislature might even have supposed that the need for statutory regulation is *greater* when individuals rather than institutions contract to care for the elderly. Thus, the risk that an aged person might be induced to give up his property in return for inadequate care, or that services upon which he becomes dependent under a life care agreement might be abruptly terminated, can become particularly acute when such services are to be furnished by the well-meaning but ill-equipped amateur.[11]

In light of such considerations, we would frustrate the objectives of the 1953 extension of the Welfare and Institutions Code were we to reinstate the limits established six years earlier by *Church*. Moreover, a judicial resurrection of *Church* would conflict with the manifest understanding upon which post-1953 legislation has consistently built. When the Legislature amended section 2300 in 1957,[12] for example, it evidently assumed that its 1953 amendment to section 2350 had broadened the reach of the Welfare and Institutions Code to encompass non-institutional life care contracts. Thus the 1957 amendment to section 2300 provided that those furnishing life care only to close relatives need not obtain a license to do so under section 2300, notwithstanding the general requirement of section 2350 that *any* person must obtain such a license before receiving a transfer of property in connection with a prepaid contract to provide life care to an aged indi-

---

[11]Given the special need to supervise the quality and the continuity of services for elderly persons, the case for broadly applicable regulation is even stronger in this area than it is in the field of annuity insurance (see Ins. Code, §§ 11520-11524), with which prepaid life care contracts have often been compared. (See, e.g., Life Care Contracts, Report of Assembly Interim Committee on Social Welfare, Assembly Interim Committee Reports 1955-1957, vol. 19, no. 3 (March 1957) p. 7.)

[12]Stats. 1957, ch. 260, § 1.

vidual. If section 2350, even after 1953, had been intended to govern only persons and organizations operating homes for the aged, then the 1957 exemption for intrafamily agreements would have been superfluous.

We therefore conclude, in accordance with the basic purposes of the statute and the construction apparently given to it by the Legislature, that the 1953 amendment limited the holding of *Church* to life care contracts previously executed.[13] ▉ Life care contracts executed *after* the effective date of that amendment, however, must comply with the requirements of the Welfare and Institutions Code whether or not the care promised by such contracts is to be furnished under institutional auspices.

### III.

▉ The 1962 agreement about which this litigation revolves clearly entailed a transfer of "property from an aged person conditioned upon an agreement to furnish life care";[14] the defendants entered into that agreement without first obtaining the license and certificate required under post-1953 law. We set forth our reasons for concluding that this illegality in itself renders the contract unenforceable and invalidates the accompanying deed.[15]

▉ The traditional reluctance of the courts to enforce

[13]The 1953 amendment does not, of course, have any effect upon life care agreements executed before its effective date. Three of our basic codes provide that no part thereof is retroactive "unless expressly so declared." (Civ. Code, § 3; Code Civ. Proc., § 3; Pen. Code, § 3.) In *Wilke & Holzheiser, Inc.* v. *Department of Alcoholic Beverage Control* (1966) 65 Cal.2d 349, 371 [55 Cal.Rptr. 23, 420 P.2d 735], we reaffirmed our previous holdings "that this language does no more than codify a general rule of construction, applicable as well to statutes containing no such provision. [Citations.]" (Cf. *Cooley* v. *County of Calaveras* (1898) 121 Cal. 482, 486 [53 P. 1075].)

[14](See fn. 9, *supra.*) Defendants suggest that Mrs. Anderson did not receive a transfer of "property" as contemplated by section 2350 "since her interest was a joint tenancy interest together with the decedent and Gilbert Larson." (Appellants' Opening Brief, p. 35.) If this view were to prevail, then anyone who wished to avoid the operation of the Welfare and Institutions Code could readily do so by creating a joint tenancy with a right of survivorship. The code's draftsmen surely did not suppose that their language would be converted into the ancient and irrelevant categories of the law of property; we would do violence to plain meaning and obvious purpose if we were to engage in any enterprise so esoteric.

[15]Defendants contend that "whether or not the agreement of June 15, 1962 is legal, the deed of the same date would still be good." (Appellants' Opening Brief, pp. 33-34.) Since the two documents were obviously part of a single transaction, the argument is too specious to merit extended discussion.

illegal bargains stems in part from the recognized importance of deterring unlawful transactions. (See *Lewis & Queen* v. *N. M. Ball Sons* (1957) 48 Cal.2d 141, 150-151 [308 P.2d 713].) So here, the need to discourage violations of the Welfare and Institutions Code points to nonenforcement of the life care contract in question.

The reasons for refusing to enforce an illegal agreement are particularly strong in cases such as the one now before us, in which the statute invalidating a contract envisions the protection of one class of persons from the unlicensed and unsupervised activities of another. (See *Lewis & Queen* v. *N. M. Ball Sons, supra,* 48 Cal.2d at p. 153.) ▆▆ Given the protective aims of the Welfare and Institutions Code, we think it crucial that this case is clearly *not* one "in which the party seeking to escape his obligation has received the full protection which the statute contemplates." (*Latipac, Inc.* v. *Superior Court* (1966) 64 Cal.2d 278, 280 [49 Cal.Rptr. 676, 411 P.2d 564].) Under these circumstances, to permit the defendants to hold the decedent to her bargain would effectively destroy the protection contemplated by the Legislature. (Cf. *Mansfield* v. *Hyde* (1952) 112 Cal.App.2d 133, 139 [245 P.2d 577], holding that defendant's failure to comply with a licensing provision designed to prevent improper persons from caring for children precludes recovery of compensation for services performed while so unlicensed.)

At the same time, the present case poses none of the considerations which occasionally support contractual recovery notwithstanding failure to comply with mandatory licensing provisions. Thus, for example, cancellation of the deed here involved and rescission of the underlying contract would work no undue forfeiture: One defendant, the decedent's brother, neither performed any service nor undertook any obligation in return for his interest in the property transferred by the deed; the other defendant, Mrs. Anderson, has not alleged that her services to the decedent were inadquately compensated, and the record would not support any suggestion that the decedent or her estate have been unjustly enriched.

Nor is this case controlled by *Keller* v. *Thornton Canning Co.* (1967) *ante,* p. 963 [59 Cal.Rptr. 836, 429 P.2d 156], in which we permitted an admittedly unlicensed carrier to collect the full price for a performed contract, reasoning that a denial of recovery would have undermined the paramount legislative policy against evasions of the minimum rate struc-

ture; in this case, unlike *Keller,* no countervailing statutory purpose requires that we subordinate the objective of deterring unlicensed transactions.

By permitting the decedent to extricate herself from this illegal agreement, we encourage statutory compliance and advance the protective purposes of the Welfare and Institutions Code without imposing disproportionate hardships upon the defendants, and without interfering with any competing objective of the Legislature. Under such circumstances, "the aims of policy can best be achieved" (*Lewis & Queen* v. *N. M. Ball Sons, supra,* 48 Cal.2d at p. 151) by cancelling the deed and rescinding the agreement.

## IV

We turn finally to an alternative basis for sustaining the trial court's order: We examine the improper means by which the defendants induced Mrs. Thorson to part with her home.

Against the factual background summarized at the outset of this opinion, we perceive no basis upon which to disturb the trial court's findings that each defendant occupied a "confidential and fiduciary relationship" to the decedent, Mrs. Thorson; that both defendants exploited that relationship by "constant harassment," reducing the decedent to a "bewildered [and] weakened mental and physical condition" in which she was "easily manipulated" and which rendered her incapable of comprehending fully the implications of the transaction urged upon her; that the decedent received "no independent advice" from "anyone of her own selection"; that such advice as she did receive was given at a time when she was "surrounded with dominant influences favoring the . . . execution of the agreement"; and that the "consideration for the . . . agreement and . . . deed was manifestly and grossly inadequate."

Since the record reveals substantial evidentiary support for all these findings, we must accept them as accurate. (See, e.g., *Waller* v. *Southern Pacific Co.* (1967) *ante,* pp. 201, 204 [57 Cal.Rptr. 353, 424 P.2d 937]; *Leonard* v. *Rose* (1967) 65 Cal.2d 589, 594 [55 Cal.Rptr. 916, 422 P.2d 604]; *Brinkmann* v. *Liberty Mutual etc. Ins. Co.* (1965) 63 Cal.2d 41, 44 [45 Cal.Rptr. 8, 403 P.2d 136].)[16] Having done so, we

---

[16]Part of the evidence summarized above came under attack as hearsay but the challenged statements were clearly admissible to show the decedent transferor's state of mind at the time the agreement and deed were

conclude that the questioned agreement was obtained by means which the law has long condemned under the label of "undue influence." (Civ. Code, § 1575; *Herbert* v. *Lankershim* (1937) 9 Cal.2d 409, 426-427, 431 [71 P.2d 220]; *Odell* v. *Moss* (1900) 130 Cal. 352 [62 P. 555]; *Ross* v. *Conway* (1892) 92 Cal. 632 [28 P. 785]; *Beckmann* v. *Beckmann* (1959) 174 Cal.App.2d 717 [345 P.2d 121]; *Rieger* v. *Rich* (1958) 163 Cal.App.2d 651 [329 P.2d 770]; *Stewart* v. *Marvin* (1956) 139 Cal.App.2d 769 [294 P.2d 114]; *Wells Fargo Bank* v. *Brady* (1953) 116 Cal.App.2d 381 [254 P.2d 71]; *Sparks* v. *Sparks* (1950) 101 Cal.App.2d 129 [225 P.2d 238].) This conclusion independently sustains the trial court's decree cancelling the joint tenancy deed, rescinding the life care contract, and quieting title in the decedent's estate.

In summary, this case illustrates two legal facets of the relationship that arose between a dependent aged person and a stranger who, in consideration of a deed to the aged person's home, promised lifetime care. The first characteristic of that relationship involves the promise itself: Although an absolute adherence to the strict theory of the freedom and sanctity of contract would lead to the rigid enforcement of the agreement here involved, we now recognize that the legality of the agreement must be judged in light of the relationship of the parties who created it; the contract cannot be torn from its social matrix. The trial court properly held here that the relationship in question was a confidential one, that the agreement flowed from undue influence, and that the contract was therefore invalid.

A second aspect of the relationship between this aged person and the stranger lies in the protective enclave within which the Legislature has enclosed it. Recognizing the unequal status of the parties and the vulnerability of the aged to exploitation, the Legislature has erected safeguards against possible overreaching. In a materialistic world, the Legislature has responded to the needs of the aged, who are ill-equipped to defend themselves against commercial aggression, by sheltering them with statutory protection. We have ex-

executed; the question of remoteness in time goes only to the weight of such evidence. (See, e.g., *Piercy* v. *Piercy* (1912) 18 Cal.App. 751, 762-763 [124 P. 561].) In any event, even if the evidentiary rulings in question had been erroneous, we have concluded that it is not reasonably probable that a result more favorable to defendants would have been reached in the absence of error. Accordingly, we could not reverse the judgment below on the basis here advanced. (Cal. Const., art. VI, § 13.)

plained that this legislation governs here; its salutary purposes deserve effective application.

The judgment is affirmed.

Traynor, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.