[Civ. No. 56770. Second Dist., Div. Two. Apr. 10, 1980.]

RICHARD E. MATTHEWS, as Trustee, etc.,
Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

Counsel

Kadison, Pfaelzer, Woodard, Quinn & Rossi, Morris Pfaelzer, Lee L. Blackman and Robert C. Pearman, Jr., for Plaintiff and Appellant.

George Deukmejian, Attorney General, Jeffrey T. Miller and Randall B. Christison, Deputy Attorneys General, Shutan & Trost, Robert H. Shutan and Marc S. Cohen for Defendants and Respondents.

Opinion

**ROTH, P. J.**—Pacific Homes, a California nonprofit corporation, has for many years in this and other states under the aegis of the United Methodist Church, operated retirement facilities for the aged under so-called life or continuing care contracts[1] which constitute a kind of annuity insurance whereunder payments are made in services and commodities in return for a lump sum transfer of cash at the outset of the contractual relationship with the continuing care recipient payor. The state, having in mind a salutary concern for the possibilities of abuse by those who undertake to provide such care, has since 1919 evidenced its continuing interest through statutory regulations and controls pertinent to the subject. For our purposes those statutory provisions were basically found in Welfare and Institutions Code sections 16300-16318.[2] In addition to requiring a state license for the provider of benefits (§ 16200), the function of which is to require a given standard or quality of care, the statutes likewise specify the necessity for a "certificate of authority" (§ 16300) which is a prerequisite to the receipt of a transferor's consideration in exchange for a commitment by the provider to fulfill its obligations under the continuing care agreement (see fn. 1). Its function concerns essentially the financial integrity of the provider,

---

[1]The terms are defined in California Administrative Code, title 22, section 84007 as follows: "'Continuing care agreement' or 'life care contract' means a contract to provide to a person for the duration of such person's life or for a term in excess of one year, nursing services, medical services, or health-related services, board and lodging and care as necessary, or any combination of such services, for such person in a facility, which may be conditioned upon the transfer of an entrance fee to the provider of such services in addition to or in lieu of the payment of regular periodic charges for the care and services involved."

[2]These sections were repealed and recodified as Health and Safety Code sections 1770-1790 effective July 1, 1978. References herein are to the Welfare and Institutions Code sections, unless otherwise indicated, as the conduct complained of on the part of Pacific Homes occurred prior to their recodification.

in the sense of a monetary ability to operate properly over the period covered by these agreements, through adequate establishment and maintenance of reserves. Each of these were duly issued to Pacific Homes and its license has never been revoked.[3]

Beginning in 1964 and continuing until 1977, Pacific Homes failed to maintain the reserves required by section 16304, in spite of the fact its officers and directors were at all times cognizant of the shortages while nevertheless continuing to operate Pacific Homes as if it were a viable corporation and, inter alia, selling life care contracts against ever diminishing reserves and resources with which to satisfy them. By thus ignoring the proper funding of reserves required by the statute, the ongoing operating deficit was increased and the company was placed irretrievably upon a course of financial ruin. Ultimately in 1977, driven to seek protection in reorganization proceedings,[4] appellant, as trustee on behalf of Pacific Homes, the debtor in bankruptcy, determined that Pacific Homes had suffered damages in the approximate sum of $19 million. Appellant then determined that by reason of the literal language of section 16313,[5] the State of California had, throughout the 13-year period, the mandatory obligation to revoke Pacific Homes' certificate of authority and brought this action against respondents of whom the State of California is one, charging that state is primarily liable for the whole of said loss on account of its failure to do so.

In brief appellant argues that it is the duty of state to make Pacific Homes solvent by payment of $19 million whereupon state will have a second chance to perform as appellant argues it must, the mandatory duty it so recklessly abandoned from 1964 through 1977. When Pacific Homes is thus rehabilitated, state will recapture its duty in every year thereafter if reserves are not properly maintained to curtail Pacific Homes' activities by revoking its certificate of authority or defend successive lawsuits to reimburse its reserve deficiencies.[6]

---

[3]The certificate of authority was revoked November 17, 1977, approximately nine months after Pacific Homes filed its petition under chapter XI of the Bankruptcy Act.

[4]The bankruptcy case, initiated under chapter XI of the Bankruptcy Act was upon Pacific Homes' motion converted to a chapter X proceeding by order of the bankruptcy judge dated December 9, 1977.

[5]Section 16313 provides: "For the failure of any organization or person to establish and maintain reserves as provided in this chapter, the department shall, after due notice, revoke its certificate of authority. The department may request the Department of Insurance to aid in the determination as to whether or not sufficient reserves are established and maintained."

[6]Numerous cases echo the principle that when damage is suffered by a corporation as a consequence of the abuse by officers or directors of their responsibilities, fiduciary

The complaint is framed in three counts and prays for relief based on theories of (1) failure to discharge a mandatory duty respecting supervision of Pacific Homes' financial affairs, (2) negligence in the same regard, and (3) for indemnity against potential claims of Pacific Homes' continuing care recipients.

We express no opinion on appellant's right to file actions against the officers and directors of Pacific Homes (see fn. 6) and we do not pass on the right of the holders of life or continuing care contracts individually or as a class to file actions against respondents or respecting any of the defenses respondents may have to such an action.

However, we do conclude appellant has no standing to and has not stated any cause of action herein and we affirm the trial court's sustaining of respondents' general demurrers and subsequent order dismissing the cause. Our determination is premised upon the reasoning which follows.

■ It is accepted by both sides that appellant, as the trustee of the chapter X estate of Pacific Homes, succeeds only to those rights of action possessed by the bankrupt on the date of bankruptcy (11 U.S.C. § 110 (a) (5)) and that he lacks authority to bring an action on behalf of a limited class of creditors or any person or entity other than his debtor corporation. (*Caplin* v. *Marine Midland Grace Trust Co.* (1972) 406 U.S. 416 [32 L.Ed.2d 195, 92 S.Ct. 1678]; *Miller* v. *New York Produce Exchange* (2d Cir. 1977) 550 F.2d 762; *Lank* v. *New York Stock Exchange* (2d Cir. 1977) 548 F.2d 61; *Rochelle* v. *Marine Midland Grace Co. of N.Y.* (9th Cir. 1976) 535 F.2d 523; *In re Duplan Corp.* (S.D.N.Y. 1978) 444 F.Supp. 952.)[7] Thus, it is conceded that insofar as the suit might purport to be for the benefit of Pacific Homes' continuing care recipients (and the complaint is interlaced with allegations showing that it is), appellant is not in a position to prosecute it.

---

and otherwise, the corporation or its stockholders may sue to recover such damages on behalf of the corporation. Appellant, however, does not in this action seek any relief against the officers and directors of Pacific Homes for their alleged breach of trust.

[7]In *Caplin, supra*, Marine Midland Grace Trust Company was the indenture trustee for debentures issued and sold by Webb & Knapp, Inc., the bankrupt, in an amount of approximately $8 million. Marine as indenture trustee had numerous responsibilities with respect to the continued supervision of Webb & Knapp. After the bankruptcy of Webb & Knapp, the debenture holders claimed as did the bankruptcy trustee, that Marine was responsible severally to each. The bankruptcy trustee as petitioner in *Caplin* with permission of the federal district court sued Marine on behalf of the bankrupt estate. The district court on Marine's motion dismissed and held that the

■ The question remains whether under the applicable statutes a cause of action subsists in favor of the bankrupt Pacific Homes itself, so as to require a contrary result. Appellant's contention such is the case depends in large part upon portions of a 1957 study by the California Assembly Interim Committee on Social Welfare in the fields of mental hygiene and social welfare, wherein eight "problem areas" were explored, including programs for the aged under life care contracts. (Assem. Interim Com. on Social Welfare, 19 Assem. Interim Com. Rep. (1955-1957), No. 3, Life Care Contracts, 3 Appen. to Assem. J.

---

bankruptcy trustee had "no standing in his capacity as a trustee in this reorganization under Chapter X...to raise claims of misconduct by an indenture trustee..." and granted Marine's motion.

In affirming, the Supreme Court said: "By alleging that the indenture trustee negligently or intentionally failed to prevent Webb & Knapp from violating the terms of the indenture, petitioner clearly alleges a violation of the 1939 legislation, 15 U.S.C. § 77ooo. But the question remains whether petitioner is a proper party to take corrective action.

"Petitioner urges that the reorganization trustee is in a far better position than debt investors to discover and to prosecute claims based on the alleged failure of an indenture trustee to live up to the provisions of the indenture....

"...petitioner asserts that to give him standing to sue on behalf of debenture holders will not encourage vexatious litigation or unduly deplete the resources of the debtor that he has been appointed to reorganize....

"Assuming that petitioner's allegations of misconduct on the part of the indenture trustee are true, petitioner has at most described a situation where Webb & Knapp and Marine were *in pari delicto*. Whatever damage the debenture holders suffered, under petitioner's theory Webb & Knapp is as much at fault as Marine, if not more so. A question would arise, therefore, whether Marine would be entitled to be subrogated to the claims of the debenture holders. The Court of Appeals thought that subrogation would be required, 439 F.2d, at 122.

" . . . . . . . . . . . . . . .

"This brings us to the third problem with petitioner's argument: i.e., suit by him on behalf of debenture holders may be inconsistent with any independent actions they might bring themselves. Petitioner and the SEC make very plain their position that a suit by the trustee in reorganization does not pre-empt suits by individual debenture holders. They maintain, however, that it would be unlikely that such suits would be brought since the debenture holders could reasonably expect that the trustee would vigorously prosecute the claims of all debt investors. But, independent actions are still likely because it is extremely doubtful that the trustee and all debenture holders would agree on the amount of damages to seek, or even on the theory on which to sue. Moreover, if the indenture trustee wins the suit brought by the trustee in reorganization, unless the debenture holders are bound by that victory, the proliferation of litigation that petitioner seeks to avoid would then ensue. Finally, a question would arise as to who was bound by any settlement.

" . . . . . . . . . .

"Thus, there is no showing whatever that by giving petitioner standing to sue on behalf of the debenture holders we would reduce litigation. On the contrary there is every indication that litigation would be increased, or at least complicated.

"For the reasons discussed above we conclude that petitioner does not have standing to sue an indenture trustee on behalf of debenture holders." (*Caplin* v. *Marine Midland Grace Trust Co.*, at pp. 426-434 [32 L.Ed.2d at pp. 202-207].)

(1957 Reg. Sess.).) In the introduction to that group's report to the Assembly it was remarked that "The purpose of the study was to determine the changes needed in present laws (relating to life care contracts) and in enforcement supervision to provide adequate protection *for all concerned.*" (Italics added.) In its preamble to findings and recommendations it was further remarked that: "Explicit authorizations of interdepartmental coordination and precise assignment of jurisdiction, a modern mortality table, and more effective supervision of required financial reserves are essential to the protection *of the purchasers and sellers* of life care, and of the taxpayers who must support elderly citizens whose life savings may be lost if contracts are not fulfilled." (Italics added.) Finally, in its summary analysis it was concluded: "Other than the need to amend the code to provide better protection for *both the buyers and sellers* of life care and thus for the taxpayer, the most significant finding of this study was the "need for more facilities in which widows without business experience may be cared for in comfort." (Italics added.) (See *Bozzo* v. *Jacobs* (1976) 59 Cal.App.3d 158 [130 Cal.Rptr. 524].)

In addition to the foregoing, appellant buttresses its argument in this regard by pointing to the fact the state has recognized an obligation to foster and protect private industry in providing housing for the aged through tax subsidies. (Rev. & Tax. Code, § 214 et seq.) No further support for the proposition providers of life care were intended as beneficiaries upon breach of the governmental obligations found in sections 16300-16318 is proffered. Respecting the committes' report, the trial court remarked: "THE COURT: Well, that may be, but I do not believe, having read that report, that that report can support the finding that you are requesting this court to make, that therefore a duty, statutory or otherwise, arises as between the State and the health care provider or life care provider, because if it mentions it to the extent that it does mention it, it seems to me it is mentioned incidentally. And I don't find the connection either with respect to the present legislation."

We are of like mind. (Cf. *People* v. *Superior Court* (*Carl W.*) (1975) 15 Cal.3d 271 [124 Cal.Rptr. 47, 539 P.2d 807]; *Van Arsdale* v. *Hollinger* (1968) 68 Cal.2d 245 [66 Cal.Rptr. 20, 437 P.2d 508].) In any event, it would appear to us from the language of the statutory provisions themselves that rather than the provider of services it is the recipient thereof whose interests were paramount to the Legislature. Thus it is said: "When necessary to secure the performance of all *obli-*

*gations* of the certificate holder *to transferors*, the department may record with the recorder of any county a notice of lien *on behalf of the transferors....*" (§ 16301.)

"Before issuing the certificate of authority, the department may, if it deems it necessary *to safeguard the interests of the aged* in the state, ..." (§ 16302), and that "The department shall make such rules and regulations as it deems best for the government of any institution or organization specified in Section 16300, in order that the rights *of aged persons* may be protected...." (§ 16309.) (Italics added.)

Our view on the point likewise finds support in those observations of other tribunals respecting the provisions in question, including our Supreme Court, to the effect that: "In this case we are called upon to construe for the first time certain statutes which seek to protect the health and welfare of aged persons in California when they enter into contractual relationships with those who would proffer life care in return for the receipt of property. We deal here with legislation designed to prevent the infliction of harm to the elderly by those who are not fully qualified to care for them under proper conditions and on reasonable terms." (*Stenger* v. *Anderson* (1967) 66 Cal.2d 970, 971-972 [59 Cal.Rptr. 844, 429 P.2d 164].) and that: "The intended purpose of section 16300 et seq. is to thwart the abuse which can occur when elderly people improvidently pay money or transfer property in exchange for the promise of future care, which may or may not be forthcoming." (*Bozzo* v. *Jacobs, supra*, 59 Cal.App.3d 158, 163.)

Accordingly, since no duties arising out of the statutes referred to inure to appellant's benefit and since no other statutory basis for relief is present (see *Williams* v. *Horvath* (1976) 16 Cal.3d 834, 838 [129 Cal. Rptr. 453, 548 P.2d 1125]; Gov. Code, § 815) no cause of action was set out and the complaint was properly dismissed.

The order appealed from is affirmed.

Compton, J., concurred.

FLEMING, J.—I concur in the view that plaintiff has no standing to sue. But I would go further and hold that the State of California has no liability for failure to revoke a state license or certificate of authority on the ground of inadequacy of financial reserves. Interpretation of a cor-

poration's financial statements and evaluation of its true financial condition involve an exercise of the state's discretionary function, for abuse or neglect of which the state is not liable. (Gov. Code, §§ 818.4, 818.2, 820.2, 821.2.)